In re Jerry WAUGH.

Jerry WAUGH, Plaintiff,

v.

Reuben ELDRIDGE and Sandra Eldridge, Defendants.

Bankruptcy No. 93–10037S.
Adv. No. 93–1017.

United States Bankruptcy Court,
E.D. Arkansas,
Batesville Division.

Sept. 9, 1994.

See also, 165 B.R. 450.

**32**

Jeffrey Hance, Batesville, AR, for debtor.

Donna Wolfe and Barbara Webb, Little Rock, AR, for defendants.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE came before the Court upon the trial on the merits of the dischargeability action filed by the debtor. Debtor seeks a determination that any debt owed to the Eldridges is dischargeable in his bankruptcy case.[1]

### I.

The defendants, Reuben and Sandra Eldridge, obtained a personal injury tort judgment against Rising Fast Rentals, a corporation of which the debtor is a shareholder. In

---

**1.** While there is no judgment rendered against the debtor in favor of the Eldridges, the Eldridges are pursuing an action against the debtor in state court.

April 1993, subsequent to obtaining judgment against Rising Fast Rentals, the Eldridges filed another state court suit against Rising Fast Rentals, the debtor, and numerous related entities, to avoid transfers of property made by the corporation, to assert personal liability against the debtor, and for imposition of a constructive trust.

In February 1993, Jerry Waugh filed his voluntary Chapter 7 petition in bankruptcy. No objections to discharge or dischargeability were filed within the time limits of the Federal Rules of Bankruptcy Procedure, whereupon the debtor's discharge was entered, on July 7, 1993. This adversary proceeding was filed by the debtor requesting that the Court determine that the claim, asserted in the state court suit against him personally, was discharged in this bankruptcy case.

The Eldridges timely answered the complaint, alleging that the debt is nondischargeable pursuant to Bankruptcy Code section 523(a) inasmuch as the Eldridges did not receive notice of the bankruptcy proceeding in sufficient time to file a complaint to object to the dischargeability of the debt or discharge of the debtor. *See* 11 U.S.C. § 523(a)(3). The Eldridges further assert that any debt owed by the debtor to the Eldridges is nondischargeable under section 523(a)(6). Specifically, the Eldridges allege that the debtor used his corporations maliciously and wilfully to prevent them from obtaining satisfaction of their judgment against the corporation.

For trial purposes only, the Court bifurcated trial of the issues. The Court first heard the section 523(a)(3) notice issue, whereupon the Court made the oral finding that the defendants did not receive notice of the bankruptcy case. Thereafter, the Court heard the merits of the dischargeability action.

## II.

On July 14, 1986, an automobile accident occurred in which Reuben Eldridge was injured. The Eldridges obtained a personal injury judgment against Rising Fast Trucking Company ("Rising Fast Trucking"), for the injuries sustained on September 23, 1992.

On February 23, 1993, the debtor filed a skeletal Chapter 7 petition in bankruptcy to which was appended a list of creditors, providing notice in part to:

> Reuben & Sandra Eldridge
> c/o Robert Stroud
> P.O. Box 2135
> Batesville, AR 72503

Stroud was not then, nor had ever been an attorney for the Eldridges. At the time the bankruptcy was filed, Art Anderson, 217 W. 2d St., Ste. 200, Little Rock, was the Eldridges' attorney. Notice of the section 341(a) meeting was mailed March 4, 1993, which notice provided that discharge or dischargeability actions were to be filed by June 20, 1993. The notice was sent to the Eldridges, again, care of Robert Stroud.

Unaware of the bankruptcy case, on April 16, 1993, the Eldridges filed a state court law suit against numerous entities and persons, including the debtor, to set aside transfers of property and obtain satisfaction of their judgment. The debtor obtained a discharge on July 7, 1993. In response to notice of the state court law suit, the debtor sought to reopen his bankruptcy case and was granted permission to pursue this dischargeability action. The Eldridges assert that since they never received notice of the bankruptcy case, any debt owed to them by the debtor was not discharged in this bankruptcy case.

■ The Bankruptcy Code provides in pertinent part:

> A discharge under section 727 ... does not discharge an individual debtor from any debt—
>
> (3) neither listed nor scheduled under section 521(a) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed in time to permit—
>
> (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge

of the case in time for such timely filing and request.

11 U.S.C. § 523(a)(3)(B).

■ The Court finds that the Eldridges did not receive notice of the bankruptcy.[2] The statute requires "notice" or actual knowledge. Notice was sent only to an attorney who never represented the Eldridges. The evidence was uncontroverted that the Eldridges had neither notice nor actual knowledge of the case. Accordingly, the Eldridges have satisfied that element of the section 523(a)(3) cause of action.

■ That does not end the inquiry under section 523(a)(3), however, inasmuch as the Eldridges must prove a cause of action under section 523(a)(6). There is a division among the bankruptcy courts as to the burden of proof under this section. Some courts require that a creditor demonstrate the merits of their dischargeability claim. *See, e.g., In re Crull,* 101 B.R. 60 (Bankr.W.D.Ark.1989); *In re Thompson,* 152 B.R. 24 (E.D.N.Y.1993); *In re Candelaria,* 121 B.R. 140, 144 (E.D.N.Y.1990); *In re Lochrie,* 78 B.R. 257 (9th Cir. BAP 1987); *In re Padilla,* 84 B.R. 194 (Bankr.D.Colo.1987). Other courts require only that notice of the bankruptcy was not provided. *See, e.g. Chapins v. Peloso (In re Peloso),* 107 B.R. 31 (Bankr.S.D.N.Y.1989). A third view requires only that the creditor meet the rather amorphous standard that it has a "viable or colorable claim" on the section 523(a)(2), (4), or (6) cause of action, but does not require that the creditor prove its claim on the merits. *See, e.g., Haga v. National Union Fire Insurance Co. of Pittsburgh (In re Haga),* 131 B.R. 320, 327 (Bankr.W.D.Tex.1991).

■ This Court believes that the better view is to require the creditor to also demonstrate the merits of the paragraph (2), (4), (6) nondischargeability action. This view is in

keeping with the express terms of the statute and the policies embodied in the Bankruptcy Code. In any dischargeability proceeding, there is a strong presumption in favor of discharge and a fresh start for the honest debtor. *Century 21 Balfour Real Estate v. Menna (In re Menna),* 16 F.3d 7, 9 (1st Cir.1994). Thus, exceptions to discharge or dischargeability will be strictly construed in favor of discharge. *Id.*

■ Secondly, section 523(a)(3)(B) does not create a separate exception for discharge merely for failure to schedule a particular creditor. Rather, the purpose of section 523(a)(3)(B) is to allow determination of dischargeability which would otherwise be barred by the time limitations of section 523(a)(c) and Rule 4007(c), Federal Rules of Bankruptcy Procedure. *In re Lochrie,* 78 B.R. 257, 259 (9th Cir. BAP 1987). Since Rule 4007(c) requires that a complaint be filed within sixty days of the date first set for the first meeting of creditors, a creditor without notice cannot timely file its complaint.

In this manner, section 523(a)(3)(B) works to preserve the right to litigate the dischargeability of a debt when the creditor did not receive notice, but, at the same time, precludes that creditor from receiving a "windfall" of nondischargeability due to a clerical error. *In re Candelaria,* 121 B.R. at 144 ("[B]ankruptcy policy favors 'discharge and a fresh start for the debtor' . . . Unless a creditor can show that his debt actually comes within the exceptions provided for in paragraphs (2), (4) .and (6), there is no reason to deny a debtor the benefit of a full discharge in a no asset case simply because he inadvertently omitted a debt.").[3]

■ In contrast, other courts, including *In re Haga,* 131 B.R. 320 (Bankr.W.D.Tex.1991), require only that the creditor show a viable

---

**2.** Debtor argues that the Eldridges do not in fact have a claim against the debtor. Claim means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). The breadth of this definition indicates that the Eldridges did in fact have a claim against Waugh in his bankruptcy case.

**3.** Of course, if the failure to schedule was intentional, a different policy may be implicated. In the instant case, as a factual matter, there was no fraud in the failure to properly provide notice to, and thereby failure to schedule, the creditors Eldridge.

claim. This standard appears to provide a windfall to the creditor, particularly as in this case where the error in failing to notice the creditors was (assuming so evidenced) due merely to clerical error.

Accordingly, the proof demonstrating that there was no notice or actual knowledge of the bankruptcy case, the creditors must prove their cause of action under section 523(a)(6). *See In re Lochrie,* 78 B.R. 257, 259 (9th Cir. BAP 1987) (burden of proof "rests solely with the creditor seeking to have its debt declared nondischargeable.").

### III.

To the extent a debt may exist against the debtor, the creditors assert the debt is nondischargeable because the debtor used his corporations maliciously and wilfully to prevent the creditors from obtaining satisfaction of their judgment against the corporation. Under the Bankruptcy Code a debt is excepted from discharge if it is "for wilful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A wilful and malicious injury exists if the debtor knows that consequences are substantially certain to occur and his actions are targeted at the creditor to the extent the conduct is almost certain to cause harm. *In re Long,* 774 F.2d 875, 881 (8th Cir.1985). Thus, the issue for this Court is whether the debtor actually took such actions, transferring assets, with the intent or purpose of preventing the Eldridges from executing on the assets.[4]

The debtor was the president and fifty percent shareholder of Rising Fast Trucking Company, an Arkansas corporation which owned and operated a tractor-trailer trucking operation. The remaining shares were held by various members of the Moore family. Incorporated in 1979 utilizing only a few trucks, the company reached its peak of operation with approximately 125 trucks in 1984 and 150 trucks in 1985. Until 1986, the profits of Rising Fast Trucking were rein-

vested in the company to purchase new trucks and increase company growth. Moreover, large amounts of cash were infused into the corporation by the shareholders.

Although trying to continue its pattern of growth, in the spring and early summer of 1986, the shareholders authorized nearly 1.5 million dollars in dividends and loans to the shareholders. Although authorized, not all of the dividends were actually paid to the shareholders. With the exception of one loan, authorized on July 30, 1986, all of the dividend and loan payments were authorized prior to the accident on July 14, 1986.

Apparently unable to obtain additional working capital through its local bank, Waugh proposed to the other shareholders that they form a new corporation, Rising Fast Transport, Inc. in order to obtain new loans and trucks. Accordingly, on June 27, 1986, the Board of Directors of Rising Fast Trucking authorized Waugh to use the name "Rising Fast Transport, Inc., as the name of a new corporation to be organized by Jerry Waugh and to operate same as a contract and common carrier." Although authorized to be organized in June, the Articles of Incorporation were not filed with the Secretary of State until August 29, 1986. Jerry Waugh and the Moores each held fifty percent of the shares of Rising Fast Transport.

The evidence was clear that Rising Fast Trucking and Rising Fast Transport were virtually the same entity, operated as one corporation. The two companies hauled the same cargo; its trucks driven by the same drivers. Indeed, when a truck was assigned with a load, the dispatcher generally did not even know which corporation owned the truck.

On July 14, 1986, a Continental Trailways bus driven by Reuben Eldridge collided with a truck owned by Rising Fast Trucking Company. After lengthy litigation and a jury verdict rendered in March 1990, in favor of Reuben Eldridge, a liability judgment was entered against Rising Fast Trucking Com-

---

4. Although the Eldridges appear to argue that this Court should enter judgment against the debtor on the debt, this Court need not determine that issue. While some of the Court's findings of fact could have some collateral estoppel effect in the state court proceedings, the Court need not determine that the debtor is liable on the debt, nor need it address all of the piercing-the-corporate-veil issues.

pany, in August 1990. Litigation regarding the amount of damages continued. Rather than proceeding to trial, however, the parties settled the damages aspect of the litigation whereupon, in April 1992, a judgment was entered in the amount of $3,000,000 in favor of Reuben Eldridge and against Rising Fast Trucking, signed in April 1992.

In 1989, Rising Fast Trucking Company's operations diminished due to economic conditions. Field expenses and insurance had risen, while revenue stayed the same. The value of its equipment started to drop. In November of 1989 Rising Fast Trucking and its related company, Rising Fast Transport, was sold to Alliance Transportation, an unrelated third party, who assimilated the Rising Fast assets into a Rising Fast Division of its own company. Debtor was employed by the new corporation at a salary of $1000 per month and obtained a consulting agreement under which he would be paid $100,000.[5]

Although it appears that the debtor's actions with regard to his corporations were imprudent and lacking in business judgment, the Court cannot determine that his decisions and actions were done wilfully and maliciously with respect to the Eldridges. The Court does not believe that the actions were targeted at the Eldridges, or that they were intended to cause harm to them. Indeed, the Court agrees with the debtor's characterization of the "randomness" of the facts in the record and the lack of analysis with regard to facts occurring after the accident in 1986.

In support of its position, the Eldridges point to the large amounts of dividends and loans paid to the corporate shareholders. While the Court believes the succinct and credible testimony of their well-qualified expert witness regarding the impact of the dividends upon the corporation, that testimony does not evidence wilful or malicious acts with regard to the Eldridges. The Eldridges' expert witness testified that in 1986, Rising Fast Trucking's liabilities exceeded its assets. Indeed, when the dividends were authorized in 1986, there were reasonable grounds to believe that the corporation would

be unable to pay creditors as debts became due. At year end, the year in which the dividends were actually authorized and paid, the situation worsened: net income showed a loss, net assets dropped, and retained earnings dropped. Since the dividends and loans were voted on and authorized prior to the time of the accident on July 14, 1986, there could not have been any intent to secrete or transfer assets from the Eldridges until such time as the accident occurred.

The Court cannot conclude that the corporation, Rising Fast Transport, was created in order to divert Rising Fast Trucking's assets because, again, the evidence demonstrates that that corporation was conceived prior to the accident. The minutes reflect that the Board of Directors authorized formation of Rising Fast Transport in June 1986, several weeks before the accident even occurred. Moreover, the manner in which the corporations were operated, as virtual alter-egos, corroborates the debtor's assertion that the purpose of the corporation was to obtain alternate financing for more trucks.

The lack of assets in the corporation indicates that there was, in fact, nothing to secrete or transfer. Indeed, when Rising Fast Trucking and Rising Fast Transport was sold to Alliance Transportation, Inc., in November 1989, Alliance paid only $1,000 for the companies. All of the trucks had been financed by Navistar and were subject to secured interests. Cash, to the extent it was available, had been extracted from the corporations prior to the accident. Thus, at the time of the accident, on July 14, 1986, there were few, if any, assets for unsecured creditors to reach.

Finally, while the Court believes Waugh to have been imprudent and many of his actions self-serving, he has been candid with the Court. Specifically, the Court believes his testimony regarding his statements to the president of Worthen Bank that he would ensure Worthen was taken care of, albeit at the expense of Rising Fast Rental's creditors. The Court believes his testimony re-

---

5. All of the funds paid pursuant to the Consulting Agreement were assigned to Navistar Financial Corporation, a company with whom Rising Fast

entities had financed their trucks. Navistar had obtained a judgment against Waugh on his guarantees of the truck financing agreements.

garding the creation of Rising Fast Transportation and how it was operated.

The Court believes his testimony that, at the time of the creation of Rising Fast Rental and later, that he did not believe the suit by the Eldridges to be an overwhelming concern of the corporation such that assets should be transferred. Accidents involving the trucking company had previously occurred without substantial damage being sustained to the corporation; the corporation had liability insurance; he believed the corporation had a claim against Trailways and Reuben Eldridge. He believed the company to be sufficiently successful to support further expansion, and, indeed, payment of large dividends.

The Court does not believe that Waugh, with knowledge of the Eldridges' rights, proceeded to take action in violation of their rights by removing assets of his corporations from their reach. *Compare In re Long,* 774 F.2d 875 (8th Cir.1985) (president acting for corporation did not intend to harm creditor's economic interests). Accordingly, any debt, if one is owed, to the Eldridges is discharged in this bankruptcy case.[6]

**ORDERED** any debt or claim owed by the debtor Jerry Waugh to the creditors Reuben and Sandra Eldridge is dischargeable in this bankruptcy case pursuant to 11 U.S.C. §§ 523, 727. A separate judgment will be entered.

**IT IS SO ORDERED.**

---

6. Of course, this does not preclude suit against any other non-debtor person or entity to recover assets or obtain monetary judgment. Indeed, to the extent that Jerry Waugh is a necessary party under state law, it is possible that he may be considered a defendant in the on-going state court action, since the discharge injunction of 11 U.S.C. § 524(a)(2) does not bar suit against the debtor solely to determine liability in order to collect from a third party. *See generally Houston v. Edgeworth (In re Edgeworth),* 993 F.2d 51 (5th Cir.1993); *Hendrix v. Page (In re Hendrix),* 986 F.2d 195 (7th Cir.1993); *Green v. Welsh,* 956 F.2d 30 (2d Cir.1992); *Cooper v. Walker (In re Walker),* 151 B.R. 1006 (Bankr.E.D.Ark.1993).