_____

No. 95-3835
_____

In re: Jerry Waugh,                    *
                                       *
            Debtor.                    *
                                       *
                                       *
-------------------------------*
                                       *
                                       * Appeal from the United States
Jerry Waugh,                           * District Court for the
                                       * Eastern District of Arkansas.
        Plaintiff - Appellant,         *
                                       *
     v.                                *
                                       *
Reuben Eldridge; Sandra                *
Eldridge;                              *
                                       *
        Defendants - Appellees.*
                                       *
                                       *
James C. Luker,                        *
                                       *
        Trustee.                       *


                        _____

            Submitted:  April 12, 1996

            Filed:  September 12, 1996
                        _____

Before MCMILLIAN, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

                        _____

JOHN R. GIBSON, Circuit Judge.

Jerry Waugh appeals the district court's judgment holding that his contingent debt to Reuben and Sandra Eldridge was non-dischargeable under section 523(a)(6) of the Bankruptcy Code and reversing the decision of the bankruptcy court. Waugh argues that the bankruptcy court was correct in its determination that the debt was dischargeable because Waugh did not willfully and maliciously remove assets from Rising Fast Trucking Company in violation of the Eldridges' rights as creditors. We affirm the judgment of the district court.

Waugh and members of the Clem Moore family formed Rising Fast Trucking in 1979. Waugh was president of the company and a fifty- percent shareholder. The company grew from 5 trucks to approximately 150 trucks by 1985.

On July 14, 1986 a truck owned by Rising Fast Trucking and a Trailways bus driven by Reuben Eldridge collided. The Eldridges brought suit against Rising Fast Trucking. In the liability phase of a bifurcated trial, the jury found Rising Fast Trucking liable for the accident and no negligence on the part of Reuben Eldridge. Before the damages phase could begin, the parties entered into an agreed judgment for $3,000,000 in compensatory damages. Because of other claims arising from the accident, the Eldridges received only $59,000 from Rising Fast Trucking's $1,000,000 liability insurance policy in partial satisfaction of their judgment against the company.

Waugh filed a voluntary Chapter 7 petition in bankruptcy in February 1993 and was granted a discharge on July 7, 1993. No objections to his discharge or the dischargeability of any debts were filed within the time frame allowed by the Federal Rules of Bankruptcy Procedure.

In an attempt to obtain satisfaction of their judgment, the Eldridges filed suit in Arkansas state court to set aside transfers

of property and pierce the corporate veil between Waugh and the company. In his answer Waugh raised his bankruptcy discharge as a defense.

Waugh then sought to reopen his bankruptcy case, asking the bankruptcy court to find that any personal liability arising from the state court action was discharged in bankruptcy. The Eldridges responded that the debt was non-dischargeable because they did not receive notice of the bankruptcy proceeding in time to object to the discharge under section 523(a)(3) of the Bankruptcy Code. See 11 U.S.C. § 523(a)(3) (1994). Further, the Eldridges argued that Waugh violated section 523(a)(6) by willfully and maliciously removing assets from the company, thus preventing them from obtaining satisfaction of their judgment.

The bankruptcy court ruled that the Eldridges did not receive notice of Waugh's bankruptcy case. See In re Waugh, 172 B.R. 31 (Bankr. E.D. Ark. 1994). The court also found that the Eldridges had the burden of proving that the debt was non-dischargeable under section 523(a)(6). The court concluded that section 523(a)(3)(B) preserves the right of a creditor not receiving notice to litigate the dischargeability of a claim.[1]

The bankruptcy court next addressed the section 523(a)(6) exception to dischargeability and concluded that Waugh did not act willfully and maliciously toward the Eldridges. Thus, any debt that Waugh might owe to the Eldridges was discharged in bankruptcy.

In drawing this conclusion, the bankruptcy court found that Rising Fast Trucking was a growth company where, until 1986, past profits and additional shareholder capital were invested into the company. The court found that in 1986 "the shareholders authorized

---

[1]Neither of the bankruptcy court's holdings regarding the lack of notice or the burden of proof were appealed.

nearly 1.5 million dollars in dividends and loans to the shareholders," all of which were authorized before the July 14 accident.

The court then found that because Rising Fast Trucking was unable to raise additional working capital in the form of accounts receivable financing from its bank, the formation of a new corporation called Rising Fast Transport was authorized in June 1986. However, the articles of incorporation for this new corporation were not filed until August 29, 1986. Waugh and the Moores each owned fifty percent of the new company which together with Rising Fast Trucking operated as a single company, hauling the same cargo, using the same drivers, and being dispatched from a common pool of available trucks.

The bankruptcy court found that because of economic conditions the companies' operations decreased in 1989. In November of that year, Rising Fast Trucking and Rising Fast Transport were sold to Alliance Transportation. Alliance paid $1,000 for the companies' names, trademarks, telephone numbers, goodwill, and customer lists. Alliance also employed Waugh at a yearly salary of $66,756.[2] Waugh also agreed to a four-year consulting agreement for $25,000 per year.

The court found that Waugh's "actions with regard to his corporations were imprudent and lacking in business judgment," but were not targeted at the Eldridges. The court believed the Eldridges' expert who testified that the dividends and loans made by Rising Fast Trucking to the shareholders placed the company in a position where it would not be able to pay its debts as they became due. However, relying heavily on the corporate minutes

---

[2]The bankruptcy court indicated a salary of $1,000 per month. However, the employment agreement introduced at the hearing specifies a yearly salary of $66,756.

introduced at the hearing, the bankruptcy court found that these dividends and loans were authorized before the July 14 accident. The minutes also indicated that the formation of Rising Fast Transport was authorized several weeks before the accident. The court found that all available cash had been extracted from the corporations before the accident, and at the time of the accident, "there were few, if any, assets for unsecured creditors to reach."

Finally, the court stated that while it believed that Waugh had acted imprudently and in a self-serving manner, he had been candid with the court. In particular, the bankruptcy court believed Waugh's explanation of his comments to Dale Cole, president of Worthen National Bank of Batesville,[3] and his testimony regarding the formation of Rising Fast Transport. The court concluded that Waugh did not remove assets from the corporation in violation of the Eldridges' rights. Thus, any debt owed to the Eldridges was discharged.

The district court held that the bankruptcy court's factual finding that Waugh's actions were not willful and malicious with respect to the Eldridges was clearly erroneous. See Eldridge v. Waugh, 198 B.R. 545 (E.D. Ark. 1995). The district court held that the entirety of the record revealed "an intentional pattern of activity by [Waugh] targeted at harming the financial interests of the Eldridges and other creditors and at improving the financial condition of the [Rising Fast Trucking] shareholders."

The district court first concluded that even if Waugh's testimony about the reasons for forming Rising Fast Transport were

---

[3]Cole testified that Waugh had stated that he had transferred assets to his children, to Clem Moore, and to trusts in order to protect himself from other creditors and that the bank would be repaid. Waugh later testified that the conversation with Cole concerned the assets of Rising Fast Rentals, not Rising Fast Trucking.

-5-

believed, his later actions showed an intent to remove assets from Rising Fast Trucking. The court noted that after the formation of Rising Fast Transport, a corporation called Rising Fast Leasing purchased trucks financed by Navistar Financial Corporation and leased them to Rising Fast Transport. Due to an interlocking guaranty with Navistar, Rising Fast Leasing and Rising Fast Trucking each became liable for the other's obligations to Navistar. Thus, the district court found that while the new assets were added to Rising Fast Leasing and leased to Rising Fast Transport, Rising Fast Trucking incurred liabilities from the transaction.

The district court next addressed the financial condition of Rising Fast Trucking. The court explained that the certified public accountant responsible for auditing Rising Fast Trucking had issued a qualified audit report because "there were related party transactions that were not disclosed and because of the uncertainty of [Rising Fast Trucking's] financial future due to the potential lawsuits from the 1986 wreck."

The district court then turned to the issuance of dividends by Rising Fast Trucking in 1986. The court noted that the corporation, an S-corporation, had never paid dividends before 1986. However, in 1986 the board of directors approved several dividend payments. According to the corporate minutes introduced at the hearing, dividends were declared in the following amounts in 1986: $550,000 on April 7; $10,000 on April 28; $50,000 on May 12; $6,000 on May 20; $10,000 on June 11; $30,000 on June 23; and $40,000 on June 27. Addressing the Eldridges' argument that the dates in the corporate minutes could not be believed, the district court noted that the certified public accountant responsible for auditing Rising Fast Trucking testified that the audit showed no dividend payments until after the July 14 accident, when a total of $800,000 was paid on July 28 and 31. The accountant also testified that from the time the audit work was completed in March 1986 and

when the report was published on May 23, 1986, the auditing firm would have inquired if the financial position of Rising Fast Trucking had materially changed and included any such change in the final published audit. The accountant stated that the firm did not learn of any dividend payments during this period of time, or it would likely have included them in the audit report.

In addition, the district court highlighted a transaction described by Waugh that appears to contradict the dividend authorization dates in the minutes. Waugh testified that he received $275,000 from the first $550,000 dividend payment. The minutes showed that this dividend was declared on April 7. Waugh testified: "I went to the bank and borrowed $265,000. The same day I wrote Rising Fast a check for $262,000. The next day Rising Fast Trucking Company paid me a dividend of $275,000 and that same day I went and paid the bank back where I'd borrowed it, so [it was] just a swap out to get the debt I owed Rising Fast off the books. I paid the debt. They paid me a dividend actually so I could pay the debt." On cross examination, Waugh was asked why the March 31, 1986 Rising Fast Trucking balance sheet did not reflect the debt he owed to Rising Fast Trucking. Waugh responded that it was because he had paid off the debts the "day before that report." The district court recognized that it would have been impossible for Waugh to use an April 7 dividend payment to pay off his debt to Rising Fast Trucking on March 31.

A certified public accountant who testified as an expert for the Eldridges testified that it was uncommon for an S-corporation like Rising Fast Trucking to distribute dividends that did not result from the current or immediately previous year's profits. In addition, the court noted the bankruptcy court's finding that at the time the dividends were paid reasonable grounds existed to believe that the corporation would be unable to pay its debts as they became due.

Finally, the district court focused on the sale of Rising Fast Trucking to Alliance. The court noted that at the time of the sale, Waugh was jointly and severally liable for the $1.8 million that Rising Fast Trucking and Rising Fast Leasing owed to Navistar. However, in exchange for assigning the four $25,000 payments from his consulting agreement with Alliance, Waugh and the Moores were released from liability on the debt. Waugh later agreed with Navistar to a $2.9 million consent judgment against Rising Fast Trucking and Rising Fast Leasing, a judgment which released him individually. The court determined that "[t]hese actions, taken after the accident, harmed the Eldridges' interests by selling [Rising Fast Trucking's] assets for a low price."

The district court concluded: "After the accident, Waugh used [Rising Fast Trucking's] assets to receive debt release for himself, to the detriment of the Eldridges. . . . [A]fter the accident Waugh engaged in an intentional course of conduct designed to insulate assets from the Eldridges." Thus, the district court held that any debt owed by Waugh to the Eldridges was non-dischargeable because it was within the willful and malicious exception to dischargeability, and the bankruptcy court's findings to the contrary were clearly erroneous.[4]

Waugh argues that his conduct was not willful and malicious under section 523(a)(6) of the Bankruptcy Code. He contends that the findings of the bankruptcy court were not clearly erroneous and the district court erred in so holding.

When reviewing a bankruptcy court's decision to deny discharge, we apply the same standard of review that the

---

[4]In addition to the factors discussed above, the district court also mentioned the bankruptcy court's discussion of several facts excluded from evidence at trial. While the bankruptcy court refused to allow Waugh to testify regarding other accidents and claims against Rising Fast Trucking, the bankruptcy court discussed this evidence in its decision.

district court is supposed to apply:  we review the bankruptcy
court's factual findings for clear error and its conclusions of
law de novo.  Although the district court's conclusions about
the bankruptcy court's decision may carry some persuasive
weight, our appellate review of the bankruptcy court's decision
is independent of the district court's opinion.

United States v. Foust (In re Foust), 52 F.3d 766, 768 (8th Cir. 1995) (per
curiam) (citations omitted).


The bankruptcy court's determination of whether a party acted
willfully and maliciously inherently involves inquiry into and finding of
intent, which is a question of fact.  See First Nat'l Bank v. Phillips (In
re Phillips), 882 F.2d 302, 305 (8th Cir. 1989).  We may not reverse the
bankruptcy court's factual findings unless after reviewing the record we
are left with the "definite and firm conviction that a mistake has been
committed."  Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)
(quoting United States v. United States Gypsum Co., 333 U.S. 364, 395
(1948)).  Even when based on witness credibility, the bankruptcy court's
factual findings are not completely insulated from appellate review.  See
Griffin v. City of Omaha, 785 F.2d 620, 626 (8th Cir. 1986).  "Where
physical, documentary or other forms of objective evidence contradict a
witness's story, or that story is so internally inconsistent or implausible
that a reasonable factfinder would not credit it, a reviewing court may
find clear error even `in a finding purportedly based on a credibility
determination.'" Id. (quoting Anderson, 470 U.S. at 575).


Section 523(a)(6) of the Bankruptcy Code provides that a debt may not
be discharged when the debtor has willfully and maliciously injured another
entity or the property of another entity.  11 U.S.C. § 523(a)(6) (1994).
Willful is defined as "`headstrong and knowing' conduct," while malicious
is "conduct `targeted at the creditor at least in the sense that the
conduct is certain or almost certain to cause harm.'"  Johnson v. Miera (In
re Miera),

926 F.2d 741, 743-44 (8th Cir. 1991) (quoting <u>Barclays Am./ Business Credit, Inc. v. Long (In re Long)</u>, 774 F.2d 875, 881 (8th Cir. 1985)). "While intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent." <u>Long</u>, 774 F.2d at 881 (footnote omitted).

After carefully studying the record before us, we hold that the bankruptcy court's findings regarding Waugh's conduct under section 523(a)(6) of the Bankruptcy Code were clearly erroneous. As illustrated by the district court's opinion, the record is replete with documentary evidence and inconsistencies that contradict Waugh's testimony and the findings of the bankruptcy court. <u>See</u> <u>Anderson</u>, 470 U.S. at 575; <u>Griffin</u>, 785 F.2d at 626.

When viewed in its entirety, the record reveals that Waugh, as president and fifty-percent shareholder of Rising Fast Trucking, repeatedly engaged in transactions to the benefit of himself and the other shareholders and to the detriment of Rising Fast Trucking creditors.

There are two statements in the district court's opinion that are troublesome. The court stated it believed that the evidence as a whole revealed "an intentional pattern of activity by the debtor targeted at harming the financial interests of the Eldridges and other creditors and at improving the financial condition of the [Rising Fast Trucking] shareholders." The court concluded by saying that it believed "that after the accident Waugh engaged in an intentional course of conduct designed to insulate assets from the Eldridges." When these statements are considered closely, however, we do not see them as evidencing factual findings, but rather as being introductory or conclusory statements in a careful analysis under the clearly erroneous test. This court has held on several occasions that the district court reviews an order of the bankruptcy court as an appellate court, and may not make its own

independent factual findings or take additional evidence to support such findings.  Wagner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir. 1987); Foust, 52 F.3d at 768.  We conclude that the district court scrupulously followed its responsibility to review the bankruptcy court order under the clearly erroneous analysis.  It analyzed the bankruptcy court order in light of the entire record, demonstrating numerous internal inconsistencies and the implausibility of the testimony.  We are satisfied that the two statements using the word "believe," statements which have caused us some concern, do not constitute factual findings and do not nullify the district court's detailed analysis determining whether the factual findings are clearly erroneous.  In any event, this court has the ultimate responsibility of making an independent determination as to whether the findings of the bankruptcy court were clearly erroneous.

Without elaboration, the bankruptcy court accepted as true the dates shown on the Rising Fast Trucking minutes.  The court also found Waugh's testimony credible.  The Eldridges argue that these findings are inconsistent and cannot be reconciled.

The minutes show that the $550,000 dividend was authorized on April 7, 1986.  Waugh testified that he received $275,000 of this dividend and used it to repay a bank loan whose proceeds he had used to repay loans from Rising Fast Trucking.  When asked why the Rising Fast Trucking loans did not appear on the March 31, 1986 balance sheet, Waugh testified that he repaid the Rising Fast Trucking loan the day before the balance sheet was issued.  He also testified that the day after he repaid the Rising Fast Trucking loan, he received the dividend payment and repaid the bank.  Thus, Waugh stated he repaid a bank loan with a dividend that was not authorized by the board of directors until about a week later.  As the district court recognized, it would have been impossible for Waugh to have used the April 7 dividend to repay a loan he testified was paid off several days earlier.  This is the type of internal inconsistency discussed in Anderson, 470 U.S. at 575, a

contradiction of Waugh's testimony by objective evidence, that undermines the underpinnings of the bankruptcy court's finding and causes us to conclude it is clearly erroneous.

Furthermore, Waugh's testimony fails to mesh with the testimony of Rising Fast Trucking's auditor. The auditor testified that no dividend payments were reported or discovered between the time when the audit was completed in March and when it was published in May. We are well aware that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574. This is not, however, a question of two permissible views. Instead, it involves a situation where the testimony of the principle witness is contradicted by other parts of his testimony, by documentary evidence, and by the testimony of other witnesses. If Waugh's testimony was internally consistent, the auditor's testimony would have verified the payment of dividends during the time frame shown in the minutes. Simply put, the unbiased independent evidence in the record does not confirm that the dividends were declared or paid before the July 14 accident, and Waugh's own testimony contradicts the dates shown in the minutes upon which he relies.[5]

The record also demonstrates that Waugh's actions with regard to Rising Fast Trucking were knowing and certain to harm the Eldridges. See Miera, 926 F.2d at 743-44.

The Eldridges' expert, whom the bankruptcy court found to be well qualified and credible, testified that it would be unusual for

---

[5]While we must not second guess the availability of certain items of evidence, or the reason for not introducing a particular item of evidence at trial, we find it interesting that neither party introduced bank records or cancelled checks showing when the dividends were actually paid and cleared through Rising Fast Trucking's bank.

-12-

an S-corporation such as Rising Fast Trucking to pay dividends like it did in 1986.  Further, the bankruptcy court also accepted the expert's testimony that at the time "when the dividends were authorized in 1986, there were reasonable grounds to believe that the corporation would be unable to pay creditors as debts became due."  This testimony, accepted by the court, is objective evidence contradicting Waugh's testimony and the bankruptcy court's finding that Waugh's actions were not directed at the Eldridges and other creditors.  Thus, we must conclude that the bankruptcy court's finding was clearly erroneous.

As the district court pointed out, these practices continued after the accident and harmed the Eldridges' interest as contingent creditors, while continuing to benefit Waugh and the other shareholders.  The corporation received only $1,000 for the sale of Rising Fast Trucking. Waugh, however, received an employment contract for $66,756 and a four-year consulting contract for $25,000 per year.  On December 4, 1989, Waugh assigned the proceeds from the consulting contract to Navistar in exchange for the release of Waugh and the Moores from personal liability on the debts owed to Navistar.  Waugh testified that Rising Fast Trucking was also released from liability, but the record fails to support this testimony. The assignment releases only Waugh and the Moores.  Further, the consent judgment executed on December 14, 1989, not discussed by the bankruptcy court, dismissed Waugh and the Moores, but continued to hold Rising Fast Trucking and Rising Fast Leasing jointly and severally liable for debts owed to Navistar.  Again, this illustrates the internal inconsistencies in Waugh's testimony that are contradicted by objective evidence in the remainder of the record.  Moreover, it demonstrates an ongoing pattern of intentional conduct continuing well after the accident--a pattern certain to harm the Eldridges' financial interests, while benefiting Waugh and the other shareholders.

We realize that the bankruptcy court found that Waugh had been candid with it, and that Waugh did not remove assets from the corporation in violation of the Eldridges' rights. While <u>Anderson</u>, 470 U.S. at 575, underscores the great deference that is given to credibility findings such as these, it also demonstrates that there is a limit to that deference when "the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." We conclude that the bankruptcy court's findings, even though based on credibility determinations, were clearly erroneous under the scope of review outlined in <u>Anderson</u>.

In sum, we are left with the "definite and firm conviction that a mistake has been committed." <u>Id.</u> at 573. We hold that the bankruptcy court's finding that Waugh did not act willfully and maliciously with respect to the Eldridges was clearly erroneous, and we affirm the district court's judgment holding that Waugh's contingent debt to the Eldridges was not discharged in bankruptcy.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-