In re David Francis HALVERSON, Ann–Marie Elaine Halverson a/k/a Ann–Marie Elaine Bauer; Debtors.

Tina ERICKSON, as parent and natural guardian of Carol Johnson, a minor, Plaintiff,

v.

David Francis HALVERSON, Defendant.

Bankruptcy No. 98–43188.
Adversary No. 98–4147.

United States Bankruptcy Court,
D. Minnesota.

Oct. 16, 1998.

Steven H. Silton, Minneapolis, MN, for Plaintiff.

Gregory R. Anderson, Hulstrand, Anderson & Larson, Willmar, MN, for Defendant.

### ORDER DETERMINING DISCHARGEABILITY OF A DEBT

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial to determine whether the defendant's debt to the plaintiff, if any, is excepted from his discharge under 11 U.S.C. § 523(a)(6).[1] Steven H. Silton appeared for the plaintiff and Gregory R. Anderson appeared for the defendant.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334 and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

### BACKGROUND

On August 17 and 18, 1992, Carol Johnson, who was then 11 years old, was visiting her mother's sister Tracy Halverson and Tracy's husband David Halverson. Tracy and David were recently married and expecting their first child. Prior to August 1992, Carol had limited interaction at family gatherings with David who was then 27 years old.

On August 17, 1992, Tracy left home to post signs advertising her car for sale. Carol was left alone with David. Carol claims that, while playing video games with David, she got up to do something and David grabbed her around her waist, pulled her to him, held her on his lap against her will, and touched her. Attempting to put his hand up under her shirt, David touched Carol's breast and she pushed his hand away. David then touched Carol, over her clothes, on her inner thigh within 1–2 inches of her vagina, for what she perceived to be a long time until she get away from him.[2]

After she freed herself, Carol ran around as David ceased her. At one point during David's pursuit, Carol barricaded herself behind chairs to keep him from reaching her. As soon as Tracy arrived in the driveway, David ceased his pursuit and behaved as though nothing unusual had happened. At the time, Carol did not tell Tracy or anyone else what had happened. She was afraid and confused, and didn't understand why David would do something so mean to her.

The next day, August 18, 1992, Tracy again left Carol alone with David. Carol's memory of what happened on August 18, 1992, is clouded. In her deposition, Carol testified that she minimally recalls the details of the second day because she quickly became successful at forgetting. At trial, Carol testified that although she cannot recall the specifics she remembers it was the "same stuff." "I remember him holding me again, touching me; I don't remember where." She also remembers that, while Tracy was home but in another room, David came up behind Carol and kissed Carol on the back of her neck.

David's version of the events of August 17, 1992, characterizes the incident as playful, consensual rough-housing and wrestling that got carried away.[3] He denies touching Carol on her breast, near her vagina, or on her legs. David stopped the wrestling when he realized that Carol was afraid. He insists

---

1. While the plaintiff's complaint also asked me to liquidate the defendant's debt to the plaintiff, I have abstained from the determination in favor of the pending state court action.

2. Carol testified that she remembered the touching on her inner thigh as having lasted about ten minutes until she freed herself.

3. David contends that wresting and rough-housing with Carol was a regular activity. He claims that they wrestled virtually all day on August 17, 1992, and that they also rough-housed on several occasions over the prior two years during which David dated Carol's aunt and became familiar with her family. Carol denies ever having wrestled or rough-housed with David, on the day in question or any other time.

that he simply knew Carol was afraid, but that he did not know why she was afraid.

David admits that in August 1992, he knew Carol was 11 years old. He also testified, however, that she looked like she was 16 years old, that she was "well-developed," and that she dressed immodestly. David stopped wrestling not only because of Carol's apparent fear, but also because of the temptation he began to experience. He explained his temptation as sexual thoughts about Carol, and pictures playing in his mind of him having sexual relations with her. David has no recollection whatsoever of the next day, August 18, 1992.

Carol told her story to her mother shortly after the incident and a criminal complaint was filed against David. The police investigated and Carol and David both gave oral and written statements.[4] The criminal case was dismissed at Carol's request because she was afraid to testify and because she did not want to cause trouble for her aunt.

## DISCUSSION

### Dischargeability Under § 523(a)(6)

Carol Johnson claims that she suffered a willful and malicious injury and that therefore David's debt to her for that injury is nondischargeable under 11 U.S.C. § 523(a)(6). In the Eighth Circuit, "willful" and "malicious" are separate elements of the § 523(a)(6) exception to discharge.

Prior to this year, "willful" meant "headstrong and knowing," and "malicious" meant "targeted at the creditor ... at least in the sense that the conduct is certain or almost certain to cause [ ] harm." *Barclays American/Bus, Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir.1985); see also *Johnson v. Miera (In re Miera)*, 926 F.2d 741 (8th Cir.1991) (extending the definitions of willful and malicious to injuries other than those from transfers in breach of security agreements).

The Supreme Court recently clarified the definition of willfulness, stating that "debts

arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau v. Geiger*, —— U.S. ——, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). "[T]he (a)(6) formulation triggers...the category 'intentional torts,' as distinguished from negligent or reckless torts." *id.;* affirming the Eighth Circuit's opinion in *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 852 (8th Cir.1997) (en banc) (debt cannot be exempt from discharge unless it is based on an intentional tort).

 In *Kawaauhau*, the Supreme Court did not address the meaning of malicious so the Eighth Circuit's formulation still obtains. In the Eighth Circuit, the element of malice contained in § 523(a)(6) addresses the harm resulting from the intentional tort constituting the injury. Malicious for purposes of § 523(a)(6) means that the debtor targeted the creditor to suffer the harm resulting from the debtor's intentional, tortious act.

 An injury is malicious when the debtor intended to harm the creditor at least in the sense that the debtor's tortious conduct was certain or almost certain to cause harm. *Waugh v. Eldridge (In re Waugh)*, 95 F.3d 706, 711 (8th Cir.1996). "While intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent." *See Long*, 774 F.2d at 881.

### The Restatement

 In the Restatement (Second) of Torts, the concepts of "injury" and "harm" are distinct. In formulating its definition of "willful," the Supreme Court relied on the Restatement's use of the term "injury," meaning the invasion of any legally protected interest of another. Restatement (Second) of Torts § 7. The Eighth Circuit's definition of malicious focuses on the resultant "harm," meaning the existence of loss or detriment in fact of any kind to a person resulting from

---

**4.** No statements were offered or admitted into evidence at the trial. However, the statements are referred to several times in the depositions and were also used during examination at trial.

The statements, as the statements closest in time to the incidents, would have been helpful. However, the parties chose to rely exclusively on their own testimony and the depositions of each other.

any cause.[5] *Id.* In fact, the notes to the Restatement indicate that malice sometimes means "the doing of an act that necessarily results in harm to another and is done without a privilege." Restatement (Second) of Torts Div. 7 Ch. 29 Intro. Note (1977). In other words, the debtor must have intended the injury (willful) and he must also have intended the harm (malicious).

### Standard of Proof

■ The preponderance of the evidence standard applies to the dischargeability exceptions in § 523(a). *United States v. Foust*

(*In re Foust*), 52 F.3d 766, 768 (8th Cir. 1995)(per curiam), citing *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### Willful

■ Intentional torts constitute a "legal category" of personal injury that is based on "the consequences of an act rather than the act itself." *See Geiger,* 113 F.3d at 852, citing Restatement (Second) of Torts § 8A, comment a, at 15 (1965). An intentional tort requires that the actor "desires to cause consequences of his act, or . . . believes that

5. The comment to § 7 reads:
 a. "Injury" and "harm" contrasted. The word "injury" is used throughout the Restatement of this Subject to denote the fact that there has been an invasion of a legally protected interest which, if it were the legal consequence of a tortious act, would entitle the person suffering the invasion to maintain an action of tort. It differs from the word "harm" in this: "harm" implies the existence of loss or detriment in fact, which may not necessarily be the invasion of a legally protected interest. The most usual form of injury is the infliction of some harm; but there may be an injury although no harm is done. Thus, any intrusion upon land in the possession of another is an injury, and, if not privileged, gives rise to a cause of action even though the intrusion is beneficial, or so transitory that it constitutes no interference with or detriment to the land or its beneficial enjoyment. So too, the mere apprehension of an intentional and immediate bodily contact, whether harmful or merely offensive, is as much an "injury" as a blow which breaks an arm. It is desirable to have a word to denote the type of result which, if the act which causes it is tortious, is sufficient to sustain an action even though there is no harm for which compensatory damages can be given. The meaning of the word "injury," as here defined, differs from the sense in which the word "injury" is often used, to indicate that the invasion of the interest in question has been caused by conduct of such a character as to make it tortious.
 b. "Harm" implies a loss or detriment to a person, and not a more change or alteration in some physical person, object or thing. Physical changes or alterations may be either beneficial, detrimental, or of no consequence to a person. In so far as physical changes have a detrimental effect on a person, that person suffers harm. Acts or conditions which affect the personal tastes, likes, or dislikes of a person may be either beneficial to him, or detrimental, or of no consequence, the same as acts which affect physical things. In so far as these acts or conditions are detrimental to him, be

suffers harm. Thus harm, as defined in this Section, is the detriment of lose to a person which occurs by virtue of, or as a result of, some alteration or change in his person, or in physical things, and also the detriment resulting to him from acts or conditions which impair his physical, emotional, or aesthetic well-being, his pecuniary advantage, his intangible rights, his reputation, or his other legally recognized interests. Frequently, where "harm" is used in this Restatement, it is qualified by some limiting adjective, such as bodily harm, physical harm, pecuniary harm, and the like. In each such case the intent is to limit the rule stated to the particular kind of harm specified. Where no such limiting adjective appears, the word is to be understood in the general sense here defined.
 c. Causal relation. The term "harm" implies no particular causal relation. It may result from the acts of the person harmed, the acts of other persons, the forces of nature, or a combination of any of these sources. However, it is only when the harm is legally caused by the acts or omissions of another that a person has any legal grounds for objection, or any legal rights in respect to the harm.
 d. Harm not necessarily actionable. Harm, like injury, is not necessarily actionable. Both, to be actionable, must be legally caused by the tortious conduct of another. In addition, harm, which is merely personal loss or detriment, gives rise to a cause of action only when it results from the invasion of a legally protected interest, which is to say an injury. Thus, where, as under the rule stated in § 436A, the harm resulting from emotional distress which has no physical consequences is not an injury to an interest legally protected against conduct which is merely negligent, the harm is not actionable.
 e. Physical harm. The words "physical harm" are used to denote physical impairment of the human body, or of tangible property, which is to say land or chattels. Where the harm is impairment of the body, it is called bodily "bodily harm," as to which see § 15.
Restatement (Second) of Torts § 7 cmt.(1965).

the consequences are substantially certain to result from [his act]." *Id.*

Carol contends that the injuries inflicted upon her by David constitute the intentional torts of assault, battery, and false imprisonment. If that is so, then the willfulness requirement of § 523(a)(6) is satisfied.

Having only the benefit of the parties' testimony, I have found the facts in this case largely based on undisputed assertions, the consistency and inconsistency of trial versus deposition testimony, and ultimately by credibility determination. David's denials are bare. Moreover, they are contradicted by his own admissions and his prior testimony, and unsupported by the undisputed facts.

To be liable for assault, David must have intended to cause harmful or offensive contact with Carol, or imminent apprehension of such contact, and Carol must have been thereby put in such imminent apprehension. Restatement (Second) of Torts § 21. David argued at length that Carol's allegation that he touched her breast was false based on minute distinctions between her several accounts of the incident.[6] Carol's testimony is consistent, however, at least to the extent that it is certain David tried to touch her breast.

I find that David at a minimum touched Carol's breast over her shirt, while Carol pushed his hand away and prevented him from putting his hand under her shirt. David committed the intentional tort of assault against Carol because he intended harmful and offensive contact upon her, and because he put her in imminent fear of that harmful contact.

To be liable for battery, David must have intended to cause harmful or offensive contact with Carol, or imminent apprehension of such contact, and harmful contact with Carol directly or indirectly must have resulted. Restatement (Second) of

Torts § 13. There is no question that David intended and achieved contact upon Carol. He characterizes it as consensual and appropriate horseplay and flatly denies touching her near her vagina. His insistence, however, lacks credibility and is undermined by his own admissions.

It is a fair characterization of events to find that David used wrestling and play as an excuse to touch Carol for his own sexual gratification. His denials ring hollow in the face of his own testimony that he thought she was well developed and dressed immodestly (which is an ill-disguised way of saying he thought she was inviting sexual contact).

It is understandable to expect that Carol may have difficulty remembering the details of an improper personal invasion by a trusted adult family member, especially as she experienced the incidence at the emotionally tender age of eleven. David's memory, however, is troubling.

He remembers the particularities of August 17, 1992, in great detail. He apparently recalls interaction with Carol on numerous occasions prior to August 1992. He remembers details of events since August 1992, yet he has virtually no recollection whatsoever of August 18, 1992. David's memory failure, conveniently aligned with Carol's blank, doesn't make sense. Combined with Carol's superior credibility and the undisputed facts, David's memory failure adds to the basis upon which I find him to be untruthful.

Aside from the suspect nature of David's selective memory, his admissions are fatal. His mind was all about sexual gratification while he was wrestling with his eleven year-old niece. He was tempted to have sexual relations with her, he observed that she was well-developed and dressed in elastic shorts, and he knew that she was afraid. He admits grabbing her and pulling her to him, but relies on his claim that he held her by the

---

6. Halverson tried to make much of Johnson's alternative claims that either Halverson put his hand up her shirt, touched her breast, and then she pushed his hand away, or that Halverson put his hand up her shirt *but* she pushed his hand away, the latter suggesting that Johnson had prevented Halverson from touching her breast. For purposes of assault, it is irrelevant whether Halverson actually touched Johnson's breast. It is worth noting, however, that a battery probably did occur in this incident even if Halverson did not touch Johnson's breast. He achieved a deliberate offensive contact, be it with her shirt, her hand or whatever part of her that he touched as part of his attempt to touch her breasts.

elbow, not the waist, and that his purpose was to play, not to put her on his lap.

David's testimony, in his deposition and at trial, amounts to a melee of countervailing assertions and a feeble attempt at weakening Carol's credibility. The effect is the opposite. David's confessed state of mind and his express acknowledgment of physical contact simply drown his alternative interpretations of the situation and destroy his own credibility.

Carol's testimony, however, is consistent. She has not changed her story. The semi-aggressive questioning meant to complicate her allegations, twist her answers or test the reliability of her memory has done little to undermine her credibility and merely indicated that she is still a child providing perhaps not carefully chosen but basically straightforward and simple language to describe her experience.

In addition to the weight of credibility determination falling in favor of Carol, other undisputed facts support her version of events. Carol told her mother and grandmother what happened shortly after the incident. A criminal complaint was filed and investigated, and dropped because Carol did not want to testify. The timeliness of Carol's confidence to her mother and the subsequent criminal action undermine David's claim that the present action is unfounded and fabricated to frustrate claims between David and his now former wife, Tracy.

It is also significant that when Carol and her sister later moved with their mother to live on David's farm, Carol stayed in a trailer with her grandmother, separate from the home on the same property in which David resided. Carol's younger sister Jenny was permitted to live in the home, and no one was concerned for Jenny in his presence.

However, I find it more significant that someone was concerned enough for Carol that she had to live apart from her mother and sister in order to keep her distance from David. Moreover, it undisputed that Carol was never alone with David during this period of living arrangements, when she was visiting her mother and sister in the house or when she was outside with the horses.

Finally, since the incident with David,[7] Carol has experienced serious emotional disturbances such as violent outbursts, self-mutilation and attempted suicide, for which she now has a long history of clinical depression counseling and therapy, including medications. She testified that she relates some portion of her battle with mental illness to her experience with David. Specifically, she has self-esteem problems, severe difficulty in relationships with men, and becomes very upset if touched below her waist. Carol's undisputed subsequent psycho-sexual problems support her version of what happened with David.

I find that David committed a battery upon Carol on August 17, 1992, when he deliberately touched her on her breast and inner thigh near her vagina over her clothing, and because on August 18, 1992, he deliberately kissed her on her neck and again engaged in some measure of inappropriate sexual touching.

■ To be liable for false imprisonment, David must have intended to confine Carol within boundaries fixed by David, and he must have acted directly or indirectly thereby causing such confinement, and Carol must have been conscious of the confinement or harmed by it. Restatement (Second) of Torts § 35. I find that on August 17 and 18th, 1992, David falsely imprisoned Carol.

David deliberately held Carol on his lap, and he confined her to his home, indirectly because he was the sole adult and authority present, and directly on August 17 by chasing her and causing her to create a blockade between them to keep him away from her. Carol knew she was so confined, and she was harmed from such confinement due to the assault and battery she thereby endured.

Since David committed three intentional torts, his conduct was willful.

*Malicious*

■ Having determined that the injury suffered by Carol was willful, the question

---

7. Johnson had some counseling when she was very young but apparently it was minimal in duration and was to address issues related to her parents' divorce.

remains whether the injury was also malicious. The maliciousness element is satisfied if, in committing the intentional torts of assault, battery, and false imprisonment, David intended the resulting harm or the harm was certain or nearly certain to result. *See Waugh*, 95 F.3d at 711; *Long*, 774 F.2d at 881. He must have targeted the harm at Carol. *Miera*, 926 F.2d at 744, citing *Long*, 774 F.2d at 881.

In order to have a meaning independent from willful, malice for purposes of § 523(a)(6) "must apply only to conduct more culpable than that which is in reckless disregard of creditors' [ ] interests and expectancies." *Long*, 774 F.2d at 881. The § 523(a)(6) malice inquiry asks whether the level of culpability can fairly be identified as "intentional harm" or whether the "conduct 'necessarily causes injury.' " *Id.*

In *Miera*, a judge gave his court reporter an unwanted kiss. For purposes of § 523(a)(6), the Eighth Circuit held that "Miera was more than reckless when he kissed Johnson because he intended to cause Johnson harm." *Miera*, 926 F.2d at 744. The Court found that Miera was certain or substantially certain that the court reporter would be harmed by an unwanted kiss because he knew the affections were not shared and that the court reporter "would be harmed by the offensive contact." *Id.*

The opinion in *Miera* demonstrates both that the § 523(a)(6) exception to discharge applies to injuries to the creditor other than of a financial nature, and that the intentional harm required by the element of malice may be satisfied by the indications of the particular circumstances and by the inherent nature of the offending injury.

In finding malice in *Miera*, the Court relied on the assumption that unwanted sexual contact is harmful and that Miera knew as much and committed the battery anyway. Accordingly, David cannot defeat maliciousness by claiming that he did not intend his tortious conduct to harm Carol, because the *Miera* opinion stands for the proposition that malice, or intent to harm, in a sexual intentional tort is self-evident, either because the tortfeasor knows his conduct is certain or almost certain to cause harm, or because he should know and therefore the intent is inferred as a matter of law.

David observed that Carol had developed breasts, and that she was mature for her age. He considered her to have the physical characteristics of a sixteen year old. Nevertheless, David knew that Carol was only eleven years old. David made physical contact with Carol anyway, knowing that his inappropriate touching was certain or almost certain to cause her harm.

There are many analogous cases that demonstrate the general application of inferred intent to harm in cases involving sexual torts and offenses, especially where the victim is a child. In *Horace Mann Insurance Company v. Independent School District No. 656*, 355 N.W.2d 413, 416 (Minn.1984), the Supreme Court of Minnesota inferred an intent to injure, for purposes of an intentional act exclusion in an insurance policy, where the act of the insured was intentional sexual misconduct. The Court held that the insured "did not subjectively intend to harm, although he intended to commit those sexual contacts to which he admits," and that "those subjective statements do not preclude this court from inferring an intent to injure *or to damage* from the nature of the acts involved." *Id.* (emphasis added); *see also Illinois Farmers Insurance Company v. Judith G.*, 379 N.W.2d 638, 641–42 (Minn.App. 1986)(recounting cases that infer as a matter of law intent to harm from nature of sexual contact with a minor).

The Eighth Circuit has reached the same conclusion. In *B.B. v. Continental Insurance Company*, 8 F.3d 1288, 1293–94 (8th Cir.1993), the Court had to decide whether the Missouri Supreme Court would adopt the inferred intent standard in cases of sexual molestation of a minor to impute an intent to harm regardless of the actor's subjective intent. The Court noted that the inferred intent standard "is now the unanimous rule among jurisdictions that have considered the issue." *Id.* at 1293.

The Court explained that "[t]he rationale behind the inferred intent standard is based

on the inherently harmful nature of child molestation." *Id.*

[A]cts of sexual molestation against a minor are so certain to result in injury to that minor that the law will infer an intent to injure on behalf of the actor without regard to his ... claimed intent.

[I]n the exceptional case of an act of child molestation, cause and effect cannot be separated; that to do the act is necessarily to do the harm which is its consequence; and that since unquestionably the act is intended, so also is the harm.

[T]he very essence of child molestation is the gratification of sexual desire. The act is the harm. There cannot be one without the other. [T]he intent to molest is, by itself, the same thing as intent to harm.

The courts following the majority approach have concluded that sexual misconduct with a minor is objectively so substantially certain to result in harm to the minor victim, that the perpetrator cannot be allowed to escape society's determination that he or she is expected to know that.

*Id.* (citations omitted).

In holding that Missouri would adopt the inferred intent standard, the Court found that the analysis behind the majority approach mirrored public policy in Missouri, especially as reflected in Missouri's criminal statutes, which provided for strict liability in cases of sexual molestation of a minor. *Id.* at 1293–94.

The Court also relied on a juxtaposition of economic and moral public policy justified by the nature of the offense of sexual contact with a minor. "[T]he benefit of ensuring compensation of the victim 'is outweighed by the effect of allowing sexual offenders to escape having to compensate minors for the harm that the courts have established is inherent in such offenses.' " *Id.* at 1295 (citations omitted).

Bankruptcy rests squarely on that crossroads of economy and morality, especially § 523(a)(6), which is precisely why these inferred intent cases are applicable. As a district court in Wisconsin held, "[T]he [inferred-intent] approach ... stands for the proposition that a person who sexually manipulates a minor cannot expect his insurer to cover his misconduct and cannot obtain such coverage simply by saying that he did not mean any harm." *Whitt v. DeLeu,* 707 F.Supp. 1011, 1016 (W.D.Wis.1989).

Similarly, § 523(a)(6) of the Bankruptcy Code stands for the proposition that a debtor who has intentionally injured and intentionally harmed his creditor cannot expect bankruptcy relief to include discharging his debt for such conduct, and he cannot obtain a discharge of that debt simply by saying that he did not mean any harm.

There is no reason why the inferred intent standard applicable to sexual misconduct against minors in other settings should not also apply in bankruptcy. Congress provided § 523(a)(6) to avoid discharging debts for morally repugnant debtor conduct (malicious intentional torts), and sexual contact with children appears to be a category of conduct defined across jurisdictions to inherently encompass malice.

 Finally, even if I did not apply an inferred intent standard, the Eighth Circuit in *Miera* reiterated that "circumstantial evidence of the debtor's state of mind could be used to ascertain whether malice existed." *Miera,* 926 F.2d at 744. David's admissions that he was sexually tempted, that he observed Carol to appear to be sixteen years of age and immodestly dressed, and that he was thinking, while he was engaging in physical contact with her, about having sexual relations with her, unambiguously define the nature of his intentions.

If that alone were yet insufficient to establish that David intended to harm Carol by his misconduct, add to that his admission that he knew she was frightened during the physical contact, and the presence of malice is manifest. If he knew she was afraid, then he knew what he was doing was harmful to her. Whether he proceeded upon realizing her fear is irrelevant to the malice inquiry. The issue of his intent to harm necessarily applies to completed conduct, and I have found that the acts as alleged occurred notwithstanding his unconvincing protestations to the contrary.

## CONCLUSION

On August 17 and 18, 1992, the defendant assaulted, battered, and falsely imprisoned the plaintiff. As a result, the defendant is indebted to the plaintiff in an unliquidated amount. The defendant's action was both willful and malicious. As a result, the defendant's debt to the plaintiff comes within the ambit of the exception to discharge under 11 U.S.C. § 523(a)(6).

## ORDER

THEREFORE, IT IS ORDERED: The defendant's debt to the plaintiff resulting from the defendant's actions on August 17 and 18, 1992, is excepted from the defendant's discharge.