**In re Paul W. GEIGER, Debtor.**

**Margaret KAWAAUHAU & Solomon Kawaauhau, Plaintiffs,**

v.

**Paul W. GEIGER, Defendant.**

**Bankruptcy No. 89–01062–293.
Adv. No. 89–0154.**

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

Aug. 23, 1994.

Warren P. Geiger, Rocky River, OH, Michael K. Sheehan, St. Louis, MO, for debtor.

Norman Pressman, St. Louis, MO, for plaintiffs.

A. Thomas DeWoskin, Trustee, St. Louis, MO.

### MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28

U.S.C. § 157(b)(2)(I), which the Court may hear and determine.

## PROCEDURAL BACKGROUND

On March 16, 1989, Dr. Paul W. Geiger filed his voluntary petition seeking protection under Chapter 7 of the Bankruptcy Code. Plaintiffs, Margaret and Solomon Kawaauhau, filed this adversary complaint seeking to deny discharge of the debts Dr. Geiger owed them as a result of a judgement they received in a state court malpractice suit. Plaintiffs assert that Dr. Geiger's conduct, which gave rise to their recoveries, was willful and malicious as those terms are used in section 523(a)(6) of the Bankruptcy Code.

## FACTUAL BACKGROUND

Upon consideration of the testimony, record and argument of counsel the Court finds that:

Debtor, Dr. Paul Geiger, served as Mrs. Kawaauhau's physician for approximately five (5) years, from 1977 until 1983, during which time he treated her for a variety of ailments, including, diabetes, obesity, hypertension, chronic obstructive pulmonary disease and congestive heart failure. On or about January 4, 1983, Mrs. Kawaauhau sought medical attention from Dr. Geiger after dropping a box on her right foot. During her visit to Dr. Geiger's office, Mrs. Kawaauhau complained of chills, dizziness, pain in her right calf and having had a 102 degree fever the previous night. Her right leg experienced some jerking. Mrs. Kawaauhau's leg was swollen and red and pus oozed from beneath the nail of the large toe on her right foot.

Dr. Geiger diagnosed Mrs. Kawaauhau's condition as thrombophlebitis of the right leg, prescribed oral doses of Tetracycline in addition to standard thrombophlebitis treatment, and admitted her to the hospital. A blood analysis performed after her admission to the hospital displayed a "left shift" in her blood's composition. After her first day in the hospital, Mrs. Kawaauhau developed a blister on her right calf. On January 5, 1983, Dr. Geiger had hospital personnel sample and analyze both tissue from Mrs. Kawaauhau's large toe and fluid from the blister on her leg. The analysis of the blister fluid identified Gram positive cocci bacteria in pairs. The culture made from Mrs. Kawaauhau's toe tissue suggested that Tetracycline was effective against the bacteria in her system. Dr. Geiger continued to treat Mrs. Kawaauhau with Tetracycline administered orally, except that she was given one dose of Vigramycin (I.V. Tetracycline) intravenously.

On January 6, 1983, further tests revealed the presence of beta streptococcus bacteria in Mrs. Kawaauhau's system. Dr. Geiger continued to treat Mrs. Kawaauhau with Tetracycline administered orally. The tests were returned five days later.

On January 7, 1983, Dr. Geiger stopped treating Mrs. Kawaauhau with Tetracycline and prescribed Penicillin for her, to be administered orally. Dr. Geiger testified in a subsequent malpractice suit, in which he was the defendant, that he knew that Penicillin, administered intravenously, would have been more effective than oral Penicillin but that he prescribed oral Penicillin because Mrs. Kawaauhau had previously conveyed to him her desire to minimize the cost of her treatment[1] and he believed she was absorbing medicine through her stomach well.

Debtor left Mrs. Kawaauhau in the care of other doctors when he went away on business on January 8, 1983. These doctors treated Mrs. Kawaauhau with Moxam and Penicillin, administered intramuscularly, and, because her condition had continued to deteriorate, arranged to fly her to Honolulu where she could receive care from an infectious disease specialist. Upon his return on January 11, 1983, Dr. Geiger canceled Mrs. Kawaauhau's transfer to Honolulu because he thought she looked stronger and more alert than when he left her days earlier.

---

1. Mrs. Kawaauhau denied ever having discussed the cost of treatment with Dr. Geiger. Solomon Kawaauhau, Margaret's husband, testified that he never told Dr. Geiger to keep costs to a minimum in treating Margaret's leg.

Also on January 11, 1983, Dr. Geiger discontinued giving Mrs. Kawaauhau all antibiotics. Dr. Geiger based this decision on the grounds that:

(a) Mrs. Kawaauhau's blood was very thin (coagulating very slowly) and that antibiotics have a tendency to thin one's blood;

(b) He thought the infection in Mrs. Kawaauhau's leg had burned itself out;

(c) a culture of the leg suggested that there was no strep bacteria left in the leg; and

(d) the Doctor was concerned with the possibility of Mrs. Kawaauhau developing a superinfection.

Mrs. Kawaauhau did not receive any antibiotics for two days and on January 14, 1983 after further deterioration in the condition of her leg, and consultation with surgeons, the decision was made to amputate Mrs. Kawaauhau's leg below the knee.

Mrs. Kawaauhau and her husband Solomon sued Dr. Geiger in the Circuit Court for the Third Circuit of Hawaii for medical malpractice based on his treatment of Mrs. Kawaauhau's right leg. The Kawaauhaus presented the expert testimony of Dr. Peter Halford, a board certified surgeon, at that trial. Dr. Halford testified that Dr. Geiger had failed to provide adequate care in his treatment of Mrs. Kawaauhau's leg when he:

(a) failed to diagnose Mrs. Kawaauhau's condition as an infection by the second day of hospitalization;

(b) administered Tetracycline to Mrs. Kawaauhau because it is not a very effective antibiotic and poses a risk to people like Mrs. Kawaauhau who have kidney problems;

(c) failed to administer Penicillin on January 5, 1983, the day the lab identified the bacteria in Mrs. Kawaauhau (the expert testimony indicated that Tetracycline, unlike Penicillin, is not effective against the type of bacteria the lab identified);

(d) prescribed oral doses of Penicillin rather than intravenous Penicillin (which ex-

pert testimony indicated would have been more effective);

(e) discontinued administering antibiotics to Mrs. Kawaauhau on January 11, 1983; and

(f) canceled Mrs. Kawaauhau's transfer to Honolulu.

Dr. Geiger testified in his own defense and acknowledged that he recognized that, from January 7 to the morning of January 12, the standard of care for Mrs. Kawaauhau was penicillin by intravenous route for her streptococcus infection. He said such treatment was the best, "... but sometimes we're not permitted to give the best." He insisted that Mrs. Kawaauhau complained that medical expenses were too high and she wanted to keep the cost down. Based on her statements he used oral penicillin, which cost $4.00 per day, in contrast with intravenous penicillin that costs $40.00 per day.

Prior to the state court trial, Dr. Halford reviewed Dr. Geiger's treatment of Mrs. Kawaauhau and prepared a report of his review. At trial Dr. Halford testified that, in his report, he had concluded that, "I feel that this patient could have been and should have been managed differently, and her outcome would have been drastically different."

In preparation for the instant adversary complaint Dr. Peter Halford gave the following testimony in his deposition:

Q. What is the first area of mismanagement that you noticed with respect to Dr. Geiger's care of Mrs. Kawaauhau?

A. The first area involved the misdiagnosing this as a phlebitis rather than an infectious process when she had very obvious signs of infection, namely, pus from the toenail, redness, swelling, fever and a high white count.

Q. What's the next area of substandard or mismanagement that you noticed in her care?

A. The next problem was that of the wrong antibiotics being utilized for treatment of her infection. He utilized Tetra-

cycline, which is not proper for the type of infection that she had, especially with her having underlying diabetes, hypertension and obesity.

Q. Eventually did Dr. Geiger administer penicillin to her?

A. That was the third problem with this case, was that he eventually did pick penicillin. It was however, some four days after he should have started penicillin and he gave it by the wrong route, primarily— I mean he gave it by the wrong route, meaning he gave it by mouth instead of by vein, and the blood levels just cannot be reached properly by mouth that you need to address this type of life-threatening infection.

Q. What do you mean by blood levels? Can you explain to us the effectiveness of oral penicillin versus intravenous?

A. By blood level I mean the amount of antibiotic that reaches the blood and in turn gets delivered to the area where the infection is proceeding. You need to get that high level of penicillin chemical into the bloodstream. And to give it by mouth means it has to go through the digestion process and get absorbed by the stomach, and even the best of oral doses won't reach as high a level as you need—as you can get by giving it intravenously directly into the bloodstream.

A. I think that cost certainly plays a role in what we choose if you have an alternative that is more economically feasible, but cost should have no role in directing your therapeutic efforts when you are dealing with life and death. And to me that was a gross error that was made by being concerned about several hundred dollars versus the loss of limb and life.

A. A fourth area of concern was that he actually stopped all intravenous antibi-

otics that were being administered to her on January 12th, I believe.

A. The significance, I believe, is that it reveals that Dr. Geiger knew, in fact, that intravenous penicillin was the appropriate standard of care for this type of problem and yet he intentionally used something that was less effective for the sake of cost.[2]

Q. (By Mr. Roehrig): Doctor, what's the necessary result of the intention of administering of substandard care under these circumstances?

A. The result is that the infection will progress at a much more rapid rate and more viciously than otherwise.

Q. In this particular case what did that result in in regards to injury to Mrs. Kawaauhau?

A. It resulted in her requiring amputation to save her life and in permanent kidney damage.

On March 25, 1987 a jury found Dr. Geiger guilty of medical malpractice and a judgment was entered in the Circuit Court of the Third Circuit, State of Hawaii in favor of the Plaintiff Margaret Kawaauhau and against Paul W. Geiger as follows: special damages, $203,040.00; general damages, $99,000.00. Judgment was also entered in favor of Plaintiff Solomon Kawaauhau and against Paul W. Geiger as follows: general damages for the loss of consortium, $18,000.00; emotional distress, $35,000.00. The total judgment entered in favor of the Plaintiffs and against Dr. Geiger was $355,040.00.

Dr. Geiger moved to Saint Louis and on March 16, 1989, filed a petition for protection under Chapter 7 of the Bankruptcy Code. Dr. Geiger's only substantial debts are those he owes the Kawaauhaus.

### DISCUSSION

This case requires the Court to interpret and apply section 523(a)(6) of the Bankruptcy

---

**2.** He defined substandard care as, "I mean that care rendered that particular patient was below the standard of care for the community in which that physician practices."

Code. Section 523(a)(6) denies a debtor the discharge of any debt "for willful and malicious injury by the debtor to another entity ..." 11 U.S.C. § 523(a)(6) (1989). Courts that have considered this exception to discharge have disagreed on its meaning. As one authority summarized the situation, courts have split "as to whether the statute requires an intentional act that results in injury [3] or an act with intent to cause injury." [4] *Perkins v. Scharffe,* 817 F.2d 392 (6th Cir.1987).

The Eighth Circuit considered the meaning of "willful and malicious" as the term is used in section 523(a)(6) in *In re Long,* 774 F.2d 875 (8th Cir.1985). *In re Long* involved a debtor who intentionally violated the terms of a security agreement by using the proceeds of certain accounts receivable, in which a creditor held a security interest, to fund an unsuccessful reorganization rather than depositing them in a collateral account as the security agreement required. *Id.* at 876. In other words, the *Long* debtor acted intentionally in misusing the proceeds but in so acting he did not intend to harm his creditor. The creditor who held the security agreement brought an adversary proceeding asking the court to deny discharge of the debt owed to it on the ground that the debtor willfully and maliciously injured the creditor by acting contrary to the security agreement.

The Circuit Court observed that "malice and willfulness are two different characteristics." *Id.,* at 880–81. In order to give meaning to malice, independent of willful, the Court determined that "only conduct more culpable than that which is in reckless disregard of the rights of creditors' economic in-

terests and expectancies" triggers § 523(a)(6)'s exception to discharge. *Id.* at 881. Seeking to articulate a "workable standard" for denying discharge under section 523(a)(6), the Court looked for guidance to the Restatement (Second) of Torts § 8A, Comment b, which qualifies its definition of intentional harm with a requirement that the expected harm be "certain or substantially certain to occur." [5] *Id.* The Eighth Circuit held that, in the context of breached security agreements, dischargeability under section 523(a)(6) turns upon "whether the conduct is (1) headstrong and knowing (willful) and, (2) targeted at the creditor (malicious), at least in the sense that it is certain or almost certain to cause financial harm." *Id.* at 881.

Applying its stated "working standard", the Circuit Court found that Long had willfully and flagrantly breached the contract he had with his secured creditor. However, because Long had testified that his actions were designed to save his company and not to harm his secured creditor, the Circuit declined to find error in the lower courts' determinations that Long had not acted maliciously, as that term is used in section 523(a)(6). 774 F.2d at 882.

The Eighth Circuit considered dischargeability under section 523(a)(6) in the context of a personal injury debt in *In re Hartley,* 874 F.2d 1254 (8th Cir.1989) (en banc). The personal injury debt in that case arose when Hartley, the owner of a tire service and auto parts shop, told an employee to clean and paint old tires with gasoline and tire black. *In re Hartley,* 75 B.R. 165, 166 (Bankr. W.D.Mo.1987), *aff'd* 100 B.R. 477 (W.D.Mo. 1988), *and rev'd* 869 F.2d 394 (8th Cir.1989)

---

**3.** See *Perkins,* 817 F.2d 392 (6th Cir.1987); *In re Cecchini,* 780 F.2d 1440 (9th Cir.1986); *Matter of Quezada,* 718 F.2d 121 (5th Cir.1983) (holding that the court will infer the intent to harm or injure when the necessary result of a wrongful, deliberate act of the debtor causes injury).

**4.** See *In re Compos,* 768 F.2d 1155 (10th Cir. 1985) ("[s]ection 523(a)(6) does not except from discharge intentional acts which cause injury; it requires instead an intentional or deliberate injury." *Id.* at 1158. (cite omitted)).

**5.** Section 8A of the Restatement of Torts 2d defines "intent" as "denot[ing] that the actor de-

sires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Comment b to that section adds "Intent is not, however limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (1965).

*and rev'd on reh'g* 874 F.2d 1254 (8th Cir. 1989) (en banc). The employee, pursuant to Hartley's instructions, went to the basement of the shop and began treating the tires. 75 B.R. at 166. Hartley, as a practical joke, threw a firecracker into the basement where his employee was working. *Id.* Fumes had collected in the poorly ventilated basement and the firecracker caused an explosion which severely injured the employee. *Id.* The employee brought a personal injury suit against Hartley in state court and Hartley filed bankruptcy shortly thereafter.[6] *Id.* The employee/plaintiff objected to the discharge of any liability Hartley owed him and the Bankruptcy Court held the employee's claim to be nondischargeable under § 523(a)(6). *Id.*

The Bankruptcy Court, in its *Hartley* decision, noted that the defendant:

> knew of the possible consequences, the present dangers, and the potential hazards of his acts. His only excuse was that he did not intend for the gasoline to explode or to burn the plaintiff. Such sanguine hopes and lack of appreciation for the **almost inevitable** results of his deliberate act cannot avoid the malicious requisite so displayed.

*In re Hartley,* 75 B.R. at 166 (emphasis added). The District Court affirmed the Bankruptcy Court's decision.

A panel of the Circuit Court reversed the District Court, holding that "as the statute [11 U.S.C. § 523(a)(6)] was written by Congress, it is the injury to the creditor which must have been intentional—not the action of the debtor which caused the accident." 869 F.2d at 395. The Eighth Circuit reheard the case en banc and an equally divided court affirmed the decision of the District Court.

After the *Hartley* decision, courts in the Eighth Circuit faced with applying section

523(a)(6) seem to have two interpretations of "willful and malicious" to choose from; one requiring a specific intent to injure the creditor, to be applied to liabilities arising in the context of security agreements and, one requiring a less specific intent, to be used in the context of personal injury liabilities. A debt which flows from a medical malpractice action does not fit squarely within either category.

Though courts in the Eighth Circuit have yet to address the dischargeability of a debt arising from medical malpractice, other courts have confronted this issue. *Perkins,* 817 F.2d 392 (6th Cir.1987), *In re Strybel,* 105 B.R. 22 (9th Cir. BAP 1989), *In re Cole,* 136 B.R. 453 (Bankr.N.D.Tex.1992).

The Bankruptcy Court for the Northern District of Texas recently applied § 523(a)(6) to deny the discharge of a debt representing a medical malpractice judgement against a debtor. *In re Cole,* 136 B.R. 453 (Bankr. N.D.Tex.1992). The *Cole* court applying the Fifth Circuit's interpretation of § 523(a)(6), found that Dr. Cole's erroneous removal of a nerve from a patient's hand during a ligament reconstruction operation constituted "a wrongful act done intentionally, which necessarily produce[d] harm and [wa]s without just cause or excuse," and concluded that section 523(a)(6)'s willful and malicious criteria had been satisfied. *Id.* at 457. Among the facts the *Cole* court found were:

(1) Dr. Cole misrepresented that he had performed ligament reconstruction surgery many times before;

(2) Dr. Cole failed to inform his patient that he had severed another patient's nerve while attempting the same procedure;

(3) Debtor concealed the fact that Enid Memorial Hospital had revoked his staff privileges;

---

**6.** The Bankruptcy Court noted that:
  (a) the estimated liability Hartley owed his employee constituted 97% of all his listed obligations;
  (b) the total of all debts, other than the potential debt Hartley owed his employee, was $30,648.16;

  (c) Hartley and his wife took home roughly $2000.00 each month; and
  (d) Hartley reaffirmed all his secured debts. From these facts, the Bankruptcy Court concluded that the sole purpose for Hartley's filing was to eliminate the debt he owed to his employee.

(4) Dr. Cole, contrary to the testimony of three other doctors, stated that the medial nerve and tendon are five millimeters apart;

(5) After the operation, Dr. Cole altered his pre-surgery notes to suggest that the patient had a nerve problem in his hand before the operation;

(6) Three doctors testified Dr. Cole provided treatment which was below the standard in the community and that debtor was grossly negligent in treating the patient;

(7) Debtor knew it was his duty to distinguish the patient's nerve from his tendon.

Finally, the *Cole* court concluded the "Debtor's conduct amounted to a willful disregard of that which he knew to be his duty and a total disregard of acceptable medical practice thereby constituting 'willful and malicious' conduct under § 523(a)(6)." *Id.* at 459.

The Sixth Circuit has applied Section 523(a)(6) to a debt which arose from a consent judgement in a medical malpractice case. *Perkins,* 817 F.2d 392 (6th Cir.1987). In the *Perkins* case the debtor, a podiatrist, unnecessarily injected a patient's foot with an unsterile needle, causing the foot to become infected. The debtor also mistreated the infected foot in that: he failed to perform the proper tests when signs of infection appeared, he did not prescribe the drug of choice following a laboratory analysis, and he failed to hospitalize the patient. *In re Perkins,* 40 B.R. 942 (Bankr.E.D.Mich.1984). The patient brought a medical malpractice suit against Dr. Perkins. Dr. Perkins then filed a Petition under Chapter 7 of the Bankruptcy Code. The parties ultimately negotiated a consent judgement which reserved the question of dischargeability for the bankruptcy court. The Sixth Circuit held that Dr. Perkins's debt represented by the consent judgement was nondischargeable under § 523(a)(6). The Sixth Circuit reasoned that Debtors' conduct "amounted to a willful disregard of his duty and a complete and total

disregard of acceptable medical practice and, therefore, constituted willful and malicious conduct." 817 F.2d at 394.

A third court, the Ninth Circuit Bankruptcy Appellate Panel, has applied section 523(a)(6) to a debt that arose in a medical malpractice context. *In re Strybel,* 105 B.R. 22 (9th Cir. BAP 1989). In that case, Dr. Strybel, a psychologist, treated a Mrs. Romano for depression over a period of approximately seven months. One night, Mrs. Romano called Dr. Strybel and visited his home. Dr. Strybel told Mrs. Romano that their doctor/patient relationship would end if she decided to stay at his house. Mrs. Romano resided at Dr. Strybel's home for the next five weeks during which time Dr. Strybel and Mrs. Romano had sexual intercourse. After Mrs. Romano moved in with Dr. Strybel, her psychotherapy sessions with him ceased. Mrs. Romano ultimately left Dr. Strybel and returned to her husband. The Romanos wrote to Dr. Strybel and demanded $600,000.00 in damages from the doctor for his conduct with Mrs. Romano. The Romanos later agreed to release Dr. Strybel from all liability in exchange for $350,000.00; $100,000.00 to be paid in cash and $250,000.00 to be paid through an unsecured promissory note. Dr. Strybel paid the Romanos the cash but defaulted on the note after making three payments and the Romanos obtained a state court judgement for the $172,000.00 balance. After Dr. Strybel filed for bankruptcy protection, the Romanos objected to the discharge of the debt owed to them claiming that section 523(a)(6) barred its discharge.

The Ninth Circuit's Bankruptcy Appellate Panel held, with little discussion, that Dr. Strybel's actions were not malicious so as to render his obligation under the promissory note nondischargeable under section 523(a)(6). *Id.* at 24. The panel distinguished *Perkins,* stating that Dr. Strybel's conduct "differed significantly" from the podiatrist's. *Id.*[7]

The *Cole, Perkins* and *Strybel* decisions convince this court that section 523(a)(6) bars

---

7. The panel also distinguished Dr. Strybel's case

from *In re Franklin,* 726 F.2d 606 (10th Cir.

the discharge of the debts Dr. Geiger owes to the Kawaauhaus. Far from standing for the proposition that section 523(a)(6) bars the discharge of all debts based upon a debtor's medical malpractice, those cases equate section 523(a)(6)'s malicious component with egregious behavior, utter incompetence or a total disregard for medical standards. Here, Dr. Geiger's treatment of Mrs. Kawaauhau was so far below the standard level of care that it can be categorized as willful and malicious conduct for dischargeability purposes.

Dr. Halford cited not one, but five decisions Dr. Geiger made during the course of his treating Mrs. Kawaauhau which, in his opinion, constituted substandard care. Some of the errors Dr. Geiger made, like his initial misdiagnosis of Mrs. Kawaauhau's condition, do not seem to have been uncorrectable and, in that sense, not too serious a deviation from medical norms. Other decisions Dr. Geiger made while treating Mrs. Kawaauhau, for example, administering Penicillin orally because that mode of delivery costs less than intravenous delivery despite the possible consequences of not delivering enough medicine to the injured area, offends even a person lacking formal medical training. In fact, Dr. Geiger admitted at the state court trial that he knew that intravenous Penicillin was the proper prescription for Mrs. Kawaauhau but he opted for the less costly treatment of orally administered Penicillin.

Dr. Halford also stated that Dr. Geiger's decisions: to treat Mrs. Kawaauhau with Tetracycline, to not prescribe Penicillin for Mrs. Kawaauhau after receiving the laboratory analysis of the bacteria in her leg, and to discontinue treating Mrs. Kawaauhau with antibiotics on January 7, 1983 were decisions that caused Mrs. Kawaauhau to receive substandard care. The Court finds that the repeated errors Dr. Geiger made in treating Mrs. Kawaauhau evidence the same "disregard of acceptable medical practice" with which the debtors in *Cole* and *Perkins* acted. Dr. Geiger's egregious errors of judgement led to the worsening of Mrs. Kawaauhau's condition and to the eventual amputation of part of her leg. The damage awards based upon the state court malpractice action against Dr. Geiger are, therefore, nondischargeable under section 523(a)(6).[8]

An Order consistent with this Memorandum Opinion will be entered this date.

## ORDER

For the reasons stated in the Memorandum Opinion issued this date, IT IS ORDERED that:

1. the debt Dr. Geiger owes to Margaret Kawaauhau based on a judgement issued from the Circuit Court of the Third Circuit, State of Hawaii as follows: special damages, $203,040.00; general damages, $99,000.00 IS NONDISCHARGEABLE; and

2. the debt Dr. Geiger owes to Solomon Kawaauhau based on a judgement issued

1984). *Franklin* involved a physician who incurred financial liability for medical malpractice when he prescribed anesthesia without investigating the patient's history, over-induced the patient with anesthesia and then tried to cover-up the records documenting his errors. In a later bankruptcy proceeding, Dr. Franklin's medical malpractice liability was held to be nondischargeable under section 17 of the Bankruptcy Act, which like section 523(a)(6) of the Code, referred to debts arising from the "willful and malicious" conduct of the debtor. The Tenth Circuit affirmed the decision of the Bankruptcy Court, finding the doctor's actions to be willful and malicious because he "intended the acts that he did perform, which acts performed in the manner and under the conditions present in this *particular situation necessarily resulted in the* injury." *Id.* at 610. The *Strybel* panel held that Dr. Strybel's acts were "simply not comparable to" the behavior of the physician in *Franklin*. 105 B.R. at 24. The Tenth Circuit has limited *Franklin*'s holding to cases decided under the Bankruptcy Act. *In re Thurman*, 901 F.2d 839, 841 (10th Cir.1990).

8. The Tenth Circuit's *Franklin* decision, and its mechanical application of section 523(a)(6)'s predecessor leads to a rule that any debt based upon medical malpractice is not dischargeable in bankruptcy. *In re Franklin*, 726 F.2d 606 (10th Cir.1984). This Court does not, today, adopt, the idea that section 523(a)(6), *per se*, bars the discharge of debts based upon medical malpractice, instead, we hold that the Debtor's conduct in treating Mrs. Kawaauhau was so far below the accepted level of care that it constitutes willful and malicious conduct.

from the Circuit Court of the Third Circuit, State of Hawaii as follows: general damages for the loss of consortium, $18,000.00; emotional distress, $35,000.00 IS NONDISCHARGEABLE.