MORRIS SHEPPARD ARNOLD, Circuit Judge.
This case raises the question whether a judgment debt resulting from a medical malpractice action is dischargeable in bankruptcy. The Kawaauhaus maintain that it is not, because it is a “debt ... for willful and malicious injury by the debtor,” which 11 U.S.C. § 523(a)(6) exempts from discharge. The bankruptcy court agreed with the Kawaauhaus, see In re Geiger, 172 B.R. 916 (Bahkr.E.D.Mo.1994), and the district court affirmed that judgment in an unpublished opinion. On further appeal, a unanimous panel of this court reversed, relying on Cassidy v. Minihan, 794 F.2d 340 (8th Cir.1986). The panel observed that the worst that might even colorably be said of the debtor’s behavior was that it was reckless, and that since there was no evidence that he intended to harm his patient, it was not possible to say that his actions were either willful or malicious, much less both. See In re Geiger, 93 F.3d 443 (8th Cir.1996).
We granted the Kawaauhaus’ subsequent suggestion for rehearing en banc, and we reverse the judgment of the district court.
I.
Mrs. Margaret Kawaauhau sought treatment from Dr. Paul Geiger after she injured her foot. He admitted her to the hospital for treatment for thrombophlebitis, ran tests that suggested the presence of an infection, and concluded that continuing the oral tetracycline that he had already prescribed would be an effective treatment for her condition. He eventually prescribed oral penicillin in place of the tetracycline. Dr. Geiger then departed on a business trip, leaving his patient in the care of other physicians, who began to administer intramuscular penicillin and decided to transfer her to an infectious disease specialist. When Dr. Geiger returned from his trip, however, he diseontin *850 ued all antibiotics because he believed that the infection had run its course. A few days later, Mrs. Kawaauhau’s condition deteriorated and her leg had to be amputated below the knee. When the Kawaauhaus succeeded in an action for malpractice against Dr. Geiger, he petitioned for bankruptcy.
In an effort to prove that the malpractice judgment was not a dischargeable debt, the Kawaauhaus introduced into evidence before the bankruptcy court certain portions of the transcript of the trial of the malpractice action. The transcript revealed that Dr. Geiger had admitted at trial that the proper treatment for the streptococcus infection with which he was faced was intravenous penicillin, that he knew that at the time, but that he had nevertheless administered the penicillin orally partly because his patient had frequently complained about medical expenses (he had been treating her for a number of years) and had specifically expressed a desire to avoid costly medicines. In response to a direct question about whether he acknowledged that intravenous penicillin was “the proper standard of care in the circumstances,” Dr. Geiger answered that he did.
The Kawaauhaus, without objection from Dr. Geiger, also introduced into evidence before the bankruptcy court the deposition of Dr. Peter Halford, a physician hired to examine both Mrs. Kawaauhau’s medical records and Dr. Geiger’s testimony in the original trial and to render expert opinions based on them. In his deposition, Dr. Halford first offered his opinion that Dr. Geiger’s treatment of Mrs. Kawaauhau had been negligent in at least four particulars: He had initially misdiagnosed her condition as phlebitis, or inflammation of the veins in her leg, rather than as an infection; he had initially given her the wrong antibiotic (tetracycline instead of penicillin); he had started penicillin too late, and then had administered it by mouth rather than intravenously; and he had stopped administering all antibiotics for a time. But Dr. Halford agreed with counsel that Dr. Geiger’s most egregious error was that he had considered the relative costs of administering oral and intravenous penicillin in deciding which treatment to choose. It is mainly on the foundation of this last exchange that the Kawaauhaus have erected their theory that Dr. Geiger acted willfully and maliciously, because, the argument runs, he intentionally rendered substandard care to Mrs. Kawaauhau, an act, the Kawaauhaus say, that necessarily led to her injury., “It is this intentional substandard treatment of the plaintiff,” the Kawaauhaus said before the bankruptcy court, “in conjunction with the other misfeasance, that is the crux of ornease.”
Whether, in forming his opinion concerning the propriety of Dr. Geiger’s treatment, Dr. Halford believed that Mrs. Kawaauhau had requested that Dr. Geiger cut costs, Dr. Halford did not say, and the bankruptcy court made no finding on the matter. Dr. Halford observed only that “cost certainly plays a role in what we choose if we have an alternative that is more economically feasible, but cost should have no role in directing our therapeutic efforts when you are dealing with life and death.” Dr. Halford then reviewed the portion of Dr. Geiger’s trial testimony in which he admitted knowing, “in fact, that intravenous penicillin was the appropriate standard of care for this type of problem and yet he intentionally used something that was less effective for the sake of cost.” Dr. Halford ended his deposition by agreeing with the Kawaauhaus’ lawyer that “Dr. Geiger intentionally administered substandard care to Margaret Kawaauhau that necessarily resulted in advancing infection in her leg, then loss of her leg, and permanent damage to her kidneys.”
The bankruptcy court, though it did not say so directly, evidently credited everything that Dr. Halford said in his deposition, and concluded that “Dr. Geiger’s treatment of Mrs. Kawaauhau was so far below the standard level of care that it can be categorized as willful and malicious conduct for dischargeability purposes.” In re Geiger, 172 B.R. 916, 923 (Bankr.E.D.Mo.1994). The bankruptcy court further opined that in the context Dr. Geiger’s consideration of costs “offends even a person lacking formal medical training.” Id. In affirming the judgment of the bankruptcy court, the district court, relying on our opinion in In re Long, 774 F.2d 875 (8th Cir.1985), indicated its belief *851 that Dr. Geiger’s admission that “he knew he was providing Mrs. Kawaauhau with substandard eare when he prescribed oral penicillin” rendered his conduct willful, and the fact that “his conduct was certain or substantially certain to cause physical harm” rendered it malicious within the meaning of the relevant provision of the bankruptcy code.
II.
We begin our consideration of this evidence by admitting to some uneasiness about the procedure employed in the bankruptcy court. The complaint before the bankruptcy court sought to have a judgment debt declared nondischargeable because, in the words of the statute, it was a “debt ... for willful and malicious injury.” See 11 U.S.C. § 523(a)(6). The relevant judgment was entered, and thus the debt was necessarily predicated on, a jury verdict that was in turn based on evidence presented at a trial. The parties did not furnish us with a copy of the trial transcript, and we are thus unable to know what testimony the jury heard that might have convinced it that Dr. Geiger had committed medical malpractice. We therefore find it hard to understand how we can decide what conduct the verdict, and thus the “debt,” was “for” within the meaning of the statute. We wonder about the propriety of going behind the pleadings in the original malpractice action, which asked for damages for Dr. Geiger’s negligence, to decide what this “debt” was “for.” (Plaintiffs prayed for punitive damages, but the issue was not submitted to the jury.) Even if the trial transcript contained particularly shocking evidence of gross negligence and recklessness, or even of intent to injure, we would have no way of knowing what testimony the jury credited, what their verdict was supported by, and therefore what the “debt” under consideration was “for.”
Dr. Geiger, however, does not raise these difficulties on appeal, and we leave them to another day, because we are of the view that the evidence before the bankruptcy court, even when viewed in a light most favorable to the Kawaauhaus, cannot make this debt one that is “for willful and malicious injury by the debtor,” as the statute requires. See 11 U.S.C. § 523(a)(6).
This phrase has a long history. It was part of the Bankruptcy Act as early as 1898, and in Tinker v. Colwell, 193 U.S. 473, 481, 490, 24 S.Ct. 505, 506-07, 48 L.Ed. 754 (1904), Mr. Justice Peckham gave it an expansive reading, leading to a holding that a judgment based on a husband’s complaint for criminal conversation (adultery) was not dis-chargeable. Despite the debtor’s argument that in order to be malicious his action had to have evidenced ill will toward the husband, the Court held that it was unnecessary under the statute for the debtor to have acted with “personal malevolence toward the husband.” Id. at 485, 24 S.Ct. at 508. It was enough (that is, the statute was satisfied) if the debt- or had committed ‘“a wrongful act, done intentionally, without just cause or excuse.’ ” Id. at 486, 24 S.Ct. at 508, quoting Bromage v. Prosser, 4 Barn. & Cres. 247, 255, 107 Eng.Rep. 1051, 1054 (K.B.1825). In order for an act to be willful, it was, according to the Court, necessary only that it be intentional and voluntary. Tinker, 193 U.S. at 486, 24 S.Ct. at 508-09. The obstacle erected by the statutory exception to discharge was therefore not nearly so formidable for a judgment creditor as a first reading of it might have made it appear. All that the creditor had to show was that the debtor had intentionally committed a wrongful act that was unjustified and unexeused. (How a wrongful act could ever be anything but unjustified, the Court did not explain.)
When the bankruptcy code was revised in 1978, the words of the exception to discharge under consideration in this case remained unchanged, but both the United States Senate and the United States House of Representatives, in reenacting what is now 11 U.S.C. § 523(a)(6), observed in legislative reports that they intended the word “willful” to mean “deliberate or intentional,” and stated specifically that to “the extent that Tinker v. Colwell ... held” that a “less strict” (Senate), or “looser” (House), “standard is intended ... [it is] overruled.” See S.Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, and H.R.Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963. Both *852 houses of Congress also specifically stated that it was their intention to overturn any cases that had applied “a ‘reckless disregard’ standard” in deciding what debts were not dischargeable. Id. Not all of the cases that we have decided after the revision have focused very precisely on the exact meaning of this new appreciation of what debts the bankruptcy code protects from discharge. See, e.g., In re Long, 774 F.2d 875 (8th Cir.1985). But in Cassidy v. Minihan, 794 F.2d 340, 344 (8th Cir.1986), our court, after a consideration of the legislative history of the revised act, held that Congress had intended to “allow discharge of liability for injuries unless the debtor intentionally inflicted an injury.”
The Sixth Circuit has put the question that is before us this way: Do the words “deliberate or intentional,” contained in the legislative reports referred to above, require an “intentional act that results in injury” or “an act with intent to cause injury” before a judgment debt can be exempt from discharge? Perkins v. Scharffe, 817 F.2d 392, 393 (6th Cir.1987), cert. denied, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987). Posed this way, we think that the question virtually answers itself. We do not hesitate to adopt the latter construction, because we believe that it is the more natural way to interpret the relevant words. For one thing, the word “intentional,” by itself, will, almost as a matter of natural reflex, cause a lawyer’s mind to turn to that category of wrongs known as intentional torts, a category that excludes injuries caused by acts that are merely negligent, grossly negligent, or even reckless. We presume that when Congress uses a word that has a fixed, technical meaning, it has used it as a term of art. Second, the word “willful” in the statute (which Congress has said means “deliberate or intentional”) modifies the word “injury,” so that what is required for nondischargeability is a deliberate or intentional injury, not merely a deliberate or intentional act. We think it fair to conclude that this means a deliberate or intentional invasion of the legal rights of another, because the word “injury” usually connotes legal injury (injuria) in the technical sense, not simply harm to a person.
Adopting the alternative construction, moreover, would render virtually all tort judgments exempt from discharge. Every act that is not literally compelled by the physical act of another (as when someone seizes my arm and causes it to strike another), or the result of an involuntary muscle spasm, is a “deliberate or intentional” one, and if it leads to injury, a judgment debt predicated on it would be immune from discharge under the alternative construction of the statute that is posed in Perkins. Indeed, we see no reason that a knowing breach of contract would not result in a judgment that would be exempt from discharge under this legal principle. Surely this proves too much. A person who deliberately and intentionally turns the wheel of an automobile to make a left-hand turn without looking up to see if traffic is coming the other way, an act very likely to lead to injury, however foolish or even reckless he or she may be, simply cannot fairly be described as committing an intentional tort.
We therefore think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort, a legal category that is based on “the consequences of an act rather than the act itself.” Restatement (Second) of Torts § 8A, comment a, at 15 (1965). Unless the actor “desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it,” he or she has not committed an intentional tort. Id. § 8A at 15.
In our ease, there is no suggestion whatever that Dr. Geiger desired to cause the very serious consequences that Mrs. Kawaauhau suffered. So much is conceded. If, therefore, he was an intentional tortfeasor as we have defined that term, he would have to have believed that Mrs. Kawaauhau was substantially certain to suffer harm as a result of his actions. Although the district court opined that “expert testimony” established that Dr. Geiger’s conduct was “certain or substantially certain to cause physical harm,” that is not enough. There is nothing in the record, so far as we can tell, that would support a finding that Dr. Geiger believed *853 that it was substantially certain that his patient would suffer harm. Indeed, he testified that he believed that Mrs. Kawaauhau was absorbing the penicillin that she was taking orally well enough to effect a cure.
Dr. Halford, moreover, never testified, except in response to a very leading question, that the harm that Mrs. Kawaauhau suffered was a substantially certain consequence of Dr. Geiger’s course of treatment. What Dr. Halford said in the main portion of his testimony was that it was a necessary result of that treatment that the infection' would “progress at a much more rapid rate and more viciously than otherwise.” He also said that, in this case, the treatment “resulted in her requiring amputation to save her life and in permanent kidney damage,” but he did not say that that was a necessary result of the treatment, only, as we understand the testimony, a result of the progress of the infection. We suspect that the course and consequences of an infection are notoriously difficult to predict, but even if Dr. Halford had testified that Dr. Geiger’s treatment necessarily (that is, inevitably) led to Mrs. Kawaauhau’s injuries, plaintiffs’ proof still falls short of the mark. As we have indicated, the real question is whether Dr. Geiger believed that these consequences were substantially certain to occur at the time that he attempted his treatment, and the record simply will not support the conclusion that he did. This is an important distinction, one in fact that defines the boundary between intentional and unintentional torts: Even if Dr. Geiger should have believed that his treatment was substantially certain to produce serious harmful consequences, he would be guilty only of professional malpractice, not of an intentional tort.
In the ease before us, as our original panel has already noted, “We believe that ... the worst thing that can be said about Dr. Geiger is that he acted recklessly in treating Mrs. Kawaauhau with relatively inexpensive antibiotics that were not as effective as more expensive ones, or in discontinuing antibiotics when he thought that the infection had run its course.” In re Geiger, 93 F.3d 443, 444-45 (8th Cir.1996). It is true, as the district court noted, that Dr. Geiger acted deliberately and intentionally when he pursued this course of conduct, but only an elaborate play on words can transform this behavior into something that is willful and malicious. It is also true that Dr. Geiger testified that he knew that intravenous penicillin was the standard treatment, but a deviation from a standard is not even always negligent, especially if, as may have been the case here, it was induced by the patient herself or Dr. Geiger reasonably believed that it was. Assuming, without deciding, that Mrs. Kawaauhau did urge Dr. Geiger to cut costs, it is perhaps true that he should have attempted to convince her that she was requesting a very foolish, indeed reckless, economy. We express no view on the duty of physicians in such circumstances, because it is unnecessary to a resolution of this case, and because the existence and scope of such a duty will usually be a matter governed by the established law of some state. Whatever the duty, a breach of it would amount only to a negligent failure to live up to professional standards.
We are aware that other circuit courts have reached legal conclusions that are at odds with our holding in this case. See, e.g., Perkins, 817 F.2d at 394, and In re Franklin, 726 F.2d 606, 610 (10th Cir.1984). We believe, however, with respect, that these decisions are not well grounded in the statute because they pay insufficient attention to the legislative history of the relevant statutoiy provisions. They do not, moreover, give appropriate weight to the well-established interpretational rule that exceptions from discharge are to be strictly construed so as to give maximum effect to the policy of the bankruptcy code to provide debtors with a “fresh start.” See, e.g., In re Kline, 65 F.3d 749, 751 (8th Cir.1995), and Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir.1993) (per curiam).
Finally, we observe that in this case we hold only that for a judgment debt to be nondischargeable under the relevant statutory provision, it is necessary that it be based on the commission of an intentional tort. We believe, as we have said, that the debtor’s conduct cannot otherwise be said to be “willful.” We express no view, however, on the question of whether it is sufficient for nondis *854 chargeability that the judgment be for an intentional tort. We note in this connection that 11 U.S.C. § 523(a)(6) requires that the injury be both “willful and malicious” before an entitlement to the exception to discharge arises. In In re Long, 774 F.2d at 881, we held that for a creditor to establish that the debtor acted maliciously, it was necessary to show that the debtor’s conduct was “targeted at the creditor”; and, since the debtor in that case (though he was an intentional tortfeasor) was not acting with a purpose to harm creditors, we concluded that he was not acting maliciously, id. at 882. Since it is not necessary to a decision in this case that we decide the meaning of the word “malicious” and the bearing, if any, that the interpretation given to that word might have on the dischargeability of a judgment debt, we have no occasion to discuss the matter, and thus we venture no opinion on it.
III.
In sum, since it is not even alleged that Dr. Geiger intended to inflict an injury on his patient, and it cannot be said that he believed that an injury was substantially certain to result, the judgment underlying this case could not have given rise to a “debt ... for willful and malicious injury by the debtor,” see 11 U.S.C. § 523(a)(6). We therefore reverse the judgment of the district court.