**In re Donald WEHRI and Norma Wehri, Debtors.**

**SECURITY BANK OF HEBRON, Plaintiff,**

**v.**

**Donald WEHRI and Norma Wehri, Defendants.**

**Bankruptcy No. 96–31644.
Adversary No. 978–7016.**

United States Bankruptcy Court,
D. North Dakota.

Sept. 9, 1997.

Ross Espeseth, Bismarck, ND, for Plaintiff.

Sheldon Smith, Bismarck, ND, for Defendants.

Wayne Drewes, Fargo, ND, trustee.

### *MEMORANDUM AND ORDER*

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the court on the Complaint of Security Bank of Hebron (Bank) seeking a determination that the unpaid balance of a 1995 consolidated term loan is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B). The Bank also alleges that the Debtors converted property pledged as collateral for the loan and seeks a determination of nondischargeability premised upon 11 U.S.C. § 523(a)(6). The Debtors generally deny the allegations. Trial was held before the undersigned on August 14,

1997. From the evidence presented the court makes the following findings of fact and conclusions of law:

## Findings of Fact

### 1.

Donald and Norma Wehri, the Debtors herein, own and reside upon 820 acres of farmland in Morton County, North Dakota. Their relationship with the Bank began in 1993 when they made three loans: a real estate loan, a chattel term loan, and an operating line of credit. Due to financial problems, the 1993 operating loan, as well as a 1994 loan, were consolidated and rolled into a term loan. By the spring of 1995, financial conditions had deteriorated to a point where the Bank was considering liquidating the term loan. The Wehris, however, were interested in continuing with farming and to that end were pursuing an FSA refinancing of the term loan. Believing their position would be taken by FSA, the Bank, on March 3, 1995, renewed the term loan in the principal amount of $122,374.50. On this date the Wehris signed two separate security agreements securing all debts. One was a blanket security agreement covering farm products, inventory, equipment, accounts, instruments and general intangibles. The other covered all crops and proceeds of crops grown upon their land. In connection with the 1995 loan, the Wehris gave the Bank a financial statement which the Bank believes omits outstanding debts to Donald Wehri's father-in-law and his uncle, from whom he purchased several items of farm equipment. The evidence surrounding the alleged omitted debts is somewhat confused, but is important, as it bears not only upon the accuracy of the financial statement but also upon the § 523(a)(6) cause of action.

Donald Wehri's father-in-law owned an OMC 15 ft. swather which the Wehris were interested in purchasing. According to Norma Wehri her father agreed to finance their purchase of the swather for $4,500, because they could not line up purchase money in 1994. He was given a security interest in the swather and it was depreciated on their 1995 tax return. Both Donald and Norma agree no payments were ever made to her father.

Donald, however, testified it belonged to his father-in-law, while Norma, on the other hand, testified that they owned it. On a farm and home plan balance sheet prepared by the Wehris, and given to FSA in January 1995, there appears an outstanding balance of $4,500 due and owing on the swather and $3,200 due and owing on a tractor. The swather is also listed as an asset on the March financial statement.

The other debt alleged to have been omitted from the financial statement stems from a tractor Donald purchased from his uncle in 1994. On direct examination Donald stated he bought the tractor, but later stated that he only leased it. His uncle was nonetheless given a security interest in the tractor, and on the January farm and home plan there appears an outstanding debt of $3,200 owing on a tractor. Both the swather as well as the tractor were later sold at a 1996 machinery auction. The advertising bill for the auction listed the equipment to be sold, inclusive of the tractor and the swather, and clearly stated Donald and Norma Wehri to be the owners. From the weight of the evidence the court must conclude that both the swather and the tractor belong to the Wehris and that as of the date of the financial statement there was $4,500 due and owing in consequence of the swather purchase and $3,200 outstanding on account of the tractor purchase-debts omitted from the financial statement.

Despite the inaccuracy of the financial statement, according to several Bank officers, the primary and overriding factor in making the 1995 loan was the pendency of the FSA buy out. The Bank's executive vice-president testified that the loan would not have been made had the Debtors not been seeking FSA refinancing. He went on to state that listing the swather deal would have made no difference "because the Bank was going to be taken out by FSA and this was the overriding reason for making the loan."

### 2.

Although the Wehris were actively engaged in loan refinancing negotiations with FSA in March 1995, by early 1996 they had decided not to refinance because it would have required a larger farming operation and

they were concerned about the ability to cash flow. As a consequence, they agreed to liquidate their farm assets and apply the proceeds therefrom to the outstanding bank loan.

Cattle were liquidated, with proceeds going to the Bank. A machinery auction was held in June 1996, with most of the proceeds also going to the Bank. The proceeds of certain property in which the Bank claims a security interest were not turned over to the Bank, however, and it is this property, pledged as collateral, which the Bank claims was converted.

With FSA refinancing no longer under consideration, the bulk of the Wehris' property was eventually liquidated. The machinery, along with the OMC swather, was ultimately sold at an auction conducted in June 1996. The swather sold for $5,900 and, according to Donald, this sum was deducted from the auction proceeds and paid to his father-in-law rather than to the Bank. Donald and Norma both agreed that although this amount was paid to their father-in-law in recognition of his security interest, he was owed only $4,500. Why the $1,400 excess was also paid to him was not explained. There was never any agreement between the Wehris and the Bank that they could retain the $1,400 excess.

In late October 1995 the Bank conducted an on-site inspection of the property pledged as collateral for the March 1995 loan. Donald Wehri was present at the time and assisted the Bank's inspecting officer by giving him the count for hay, grain, cattle and pigs. Although the Bank's officer personally observed the existence of this property, he relied upon Donald to provide the actual physical count. On this report, which Donald signed, are indicated precise quantities of livestock, grain and machinery. Three thousand bushels of wheat at $4.50 per bushel are indicated as existing, as are one thousand tons of hay at $30 per ton. In November 1995, 1,021.98 bushels of wheat were sold with proceeds of $4,615.19 paid over to the Bank. According to their bankruptcy schedules there remains on hand 534 bushels. Missing are 1,444 bushels.[1] According to both Debtors, they never had 3,000 bushels; instead, they claim the count provided the Bank in the October 1995 inspection report was erroneous. According to Donald, only 1,500 bushels actually existed at that time. Norma agreed with this and said she told Donald it was inaccurate. Neither, however, made any effort to correct the report or tell the Bank of the mistake. They could not explain their action.

The Wehris put up 1995 hay and carried it over to 1996. In August 1996, this hay was sold to the Debtors' neighbor, Edwin Richter, for $10,000. None of the proceeds went to the Bank. At the time, Donald was aware the Bank claimed a security interest in the hay but never obtained a release, stating at trial he was relying upon advice of counsel. Precisely what this advice was, was not revealed except that Donald believed that because his 1995 operating loan had been paid off from the sale proceeds of his cattle liquidation the hay no longer served as collateral. He did not tell anyone at the Bank of this sale and no one at the Bank told him he could sell the hay in disregard of the Bank's lien. To the contrary, a Bank officer specifically told the Debtors' attorney they were claiming a security interest in the hay. One of the Bank's officers testified that Donald quite possibly believed it was acceptable to sell the hay.

Despite the 1995 inspection report revealing the existence of hogs and a conversation in March 1996 where the Debtors told the Bank they had $1,000 worth of hogs on hand, no proceeds from the sale of hogs ever passed to the Bank. Norma testified that as the hogs were sold the proceeds were retained because the Bank did not want proceeds from any sale of under $500. No Bank officer verified this assertion.

3.

The Wehris filed for relief under Chapter 12 on December 26, 1996. Their schedules and statement of affairs contain inaccuracies

---

1. The Debtors sold 1,021.98 bushels for $4,615.19 which breaks down to $4.56 per bushel.

which cast a shadow on the credibility of their trial testimony. At the time of filing, the Wehris had in their possession cattle belonging to a neighbor, yet this fact is not disclosed in answer to statement of affairs question 14. Nor do they reveal any sums paid to their attorney in answer to statement of affairs question 9, except for a $160 filing fee, despite the fact, as testimony demonstrated at trial, that $5,000 from the sale of hay went to their attorney for fees associated with the bankruptcy filing.

At the time of filing, Donald was co-signer on his son's outstanding student loan, yet this fact was not disclosed on the schedules. Also omitted was the item of 80 acres of farmland upon which Donald is the record title holder subject to a life estate in his parents. He also omitted ownership of an automobile. Despite being given a warranty deed for the land, Donald testified he thought it belonged to his parents. Donald holds title in an automobile, but said it was his son's car and that he only co-signed for the loan with his son making the payments, claiming this as the reason it was omitted from the schedules.

### Conclusions of Law

#### 1.

##### Sections 523(a)(2)(A); (a)(2)(B)

The Bank argues that the Wehris obtained their 1995 operating loan and refinancing by means of false representations. More specifically, the Bank charges that they caused the Bank to rely upon a false financial statement.

Sections 523(a)(2)(A) and (a)(2)(B) are the operative provisions of section 523, rendering nondischargeable debts traceable to fraud or to materially false financial statements. As to either, the elements essential to their proof must be established by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Sections 523(a)(2)(A) and (B) provide as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(a) of this title does not discharge an individual debtor from any debt—
>
> \* \* \* \* \* \*

> (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> [or]
>
> (B) use of a statement in writing—
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive;

Nondischargeability is established under section 523(a)(2)(A) upon proof of the following five elements:

(1) that the debtor made representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor justifiably relied upon such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representation.

11 U.S.C. §§ 523(a)(2)(A) and (B); *see Field v. Mans,* 516 U.S. 59, ——, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995) (declaring that the level of reliance required is justifiable reliance); *Thul v. Ophaug (In re Ophaug),* 827 F.2d 340. 342 n. 1 (8th Cir.1987); *In re Larson,* 136 B.R. 540. 543 (Bankr.D.N.D. 1992).

Section 523(a)(2)(B) pertains to actual writings respecting a debtor's financial condition. As to this section the following five elements must be established:

(1) the debtor makes;

(2) a statement in writing;

(3) respecting the debtor's or an insider's financial condition;

(4) which statement is materially false;

(5) which is made with the intent to deceive, and

(6) which is reasonably relied upon by the creditor.

11 U.S.C. § 523(a)(2)(B); *see In re Frey,* 150 B.R. 742, 745 (Bankr.D.N.D.1992).

 The Bank's argument is twofold based upon the Debtors' assurances in March 1995 that an FSA loan would be obtained coupled with the financial statement which was inaccurate as to the indebtedness remaining on the several items of machinery. As for the intended refinancing by FSA, there is nothing in evidence suggesting that in March 1995 the process was not being undertaken in good faith or that the Wehris had no intention of consummating the deal. That apparently did not happen until a year later. The evidence falls short of establishing that the Wehris falsely represented their intent to refinance with FSA. The financial statement is false but it too falls short of the proof needed under section 523(a)(2)(B). While false, it is not "materially false." Materiality is any statement that paints a substantially untruthful picture of a financial condition by misrepresentation of the type which would normally affect the decision to grant credit. *Norris v. First Nat'l Bank (In re Norris),* 70 F.3d 27, 30 (5th Cir.1995); *Jordan v. Southeast Nat'l Bank (In re Jordan),* 927 F.2d 221, 223 (5th Cir.1991), overruled on other grounds by *Coston v. Bank of Malvern (In re Coston),* 991 F.2d 257 (5th Cir.1993); *In re Frey,* 150 B.R. at 745. From the testimony of the several Bank officers it does not appear that the inclusion of the two machinery obligations would have had any impact upon the Bank's decision to grant a loan renewal. Indeed, it does not appear that the Bank relied upon the statement to any great extent in making its decision. Rather, of overriding import was the pending FSA refinancing and resulting buyout, which served as the inducement. As recounted in the findings of fact, one of the Bank's officers acknowledged that they would have made the loan even if the omitted information had been on the financial statement. The court concludes that the omission was not material and that the Bank did not rely upon it in its decision. Accordingly, the Bank's proof fails under sections 523(a)(2)(A) and (a)(2)(B).

**2.**

*Section 523 (a)(6).*

Section 523(a)(6) precludes discharge of a debt:—

"for willful and malicious injury by the debtor to another entity or to the property of another entity."

11 U.S.C. § 523(a)(6).

 Under the foregoing section, a conversion of property belonging to another may, if committed with the requisite willfulness and maliciousness, result in a nondischargeable debt. 10 COLLIER ON BANKRUPTCY ¶ 523.12, pp. 523–91–92 (15th ed. rev. 1997); *accord In re Lacina,* 162 B.R. 267, 274–76 (Bankr.D.N.D.1993). Deliberately disposing of property pledged as collateral in contravention of a security interest in that collateral will constitute conversion. *United States v. Foust (In re Foust),* 52 F.3d 766, 769 (8th Cir.1995) (per curiam). A technical conversion, however is not enough to render their claim exempt from discharge. The evidence must establish by a preponderance that the conversion was both willful and malicious. In a series of decisions the Eighth Circuit Court of Appeals defined each of these elements, declaring in *Barclays Am./ Bus. Credit, Inc. v. Long (In re Long),* 774 F.2d 875, 880–81(8th Cir.1985), that they are two separate characteristics. The element of "willfulness" was defined in *Johnson v. Miera (In re Miera),* 926 F.2d 741, 744 (8th Cir.1991), as an act which is deliberate or intentional rather than merely negligent or reckless. More recently in *Geiger v. Kawaauhau (In re Geiger),* 113 F.3d 848, 852 (8th Cir.1997), the court took the definition of "willfulness" a step further by giving definition to the meaning of "deliberate or intentional"—themselves former defining words. These words, said the court, mean an act with intent to cause injury. "What is required for nondischargeability is a deliberate or intentional injury, not merely a deliberate or intentional act." *In re Geiger,* 113 F.3d at 852. It is observed that the new definition of "willfulness" is contrary to the generally accepted meaning of the word and seems at

first blush to be at odds with previous decisions of the Eighth Circuit itself. Although the *Geiger* court specifically said it was not revisiting the meaning of "maliciousness," when one reads the *Long* definition of maliciousness in tandem with *Geiger's* new definition of willfulness, it appears the former definition of maliciousness has been subsumed by the newly expanded definition of willfulness. Indeed, in *Long,* the circuit adopted the Restatement (Second) of Torts, § 8(A) definition in arriving at a definition of malice. In *Geiger,* the court again turned to § 8(A) of the Restatement, this time as an aid to arriving at a definition for "deliberate and intentional"—the secondary defining words for willfulness. *Long* said malicious conduct is that which is "targeted at the creditor ... at least in the sense that the conduct is certain or almost certain to cause financial harm." *See also Waugh v. Eldridge (In re Waugh),* 95 F.3d 706 (8th Cir.1996). When transfers and breach of a creditor's security interest are an issue, the notion of malice means conduct which is *intended* to cause harm. *Long,* 774 F.2d at 881. This definition of malice seems to be merely another way of defining deliberate or intentional as acting with intent to cause injury. In the pre-*Long* decision of *In re Fercho,* 39 B.R. 764 (Bankr. D.N.D.1984), this Court, relying upon the Restatement, stated that an act is malicious if it is "done intentionally, without just cause or excuse, and with the intent to injure." In application, *Geiger* has not significantly changed in a subjective sense the long recognized two-part analysis required for nondischargeability under § 523(a)(6), but has merely placed the entire consideration under "willfulness." In conversion actions courts are still left with the difficult task of determining whether from a preponderance of the evidence a debtor, without just cause or excuse, intended by his action to injure or do harm to the property interests of another.

■ In the case at bar, as in all cases of this nature, the Debtors have denied any intent to injure the interests of the Bank and have offered a variety of explanations ranging from, "I thought I could do it," to "My lawyer said it was okay." Whether intent to harm is a measure of willfulness or of malice or of both, it remains an element that must,

in conversion cases, be established by proof that a debtor acted with knowledge and intent that the creditor's interest would be harmed as a consequence of the act. *United States v. Foust (In re Foust),* 52 F.3d 766, 769 (8th Cir.1995); *In re Clark,* 50 B.R. 122, 125 (Bankr.D.N.D.1985). In *Waugh, supra,* the circuit said that the inquiry into intent is a question of fact and (citing *Long* ), courts may consider objective information in making the determination. The evidence before the court clearly establishes that Wehris knew the Bank had a security interest in virtually everything they owned including machinery, livestock, harvested crops, and growing crops. They had a persistent relationship with the Bank over several years, they were familiar with lending documents and knew the importance of security agreements, financial statements, and related inspections. Nothing in evidence suggests the Wehris did not understand or were confused by anything on the security agreements—anymore than they were later confused by bankruptcy disclosure requirements. What appears abundantly clear from the Debtors' actions throughout the period March 1995 through December 1996, when they filed for Chapter 12 relief is that they pretty much did as they pleased, willfully ignoring the security interest and disclosure requirements.

■ Except for the hay sale, the excuses offered by each of the Debtors are not supported by anything other than the self-serving statements of each other. The 1995 hay crop was sold with the proceeds in part used to pay their attorney upon whose advice they purportedly relied. Reliance upon advice of counsel may constitute a defense where counsel, fully apprised of the facts, advises as a matter of law, and where the debtor acts on the advice believing it to be correct. *In re Erdman,* 96 B.R. 978, 985 (Bankr.D.N.D.1988). It is not known here precisely what counsel's advice was. What is known is that the Wehris, acting in reliance on that advice and ignoring the asserted lien claimed by the Bank, sold $10,000 worth of hay. Their counsel knew of the security agreements and had been told by Bank officers that the Bank claimed a lien. Armed with this knowledge and knowing his clients

were about to file bankruptcy, counsel acted irresponsibly in advising his clients to dispose of the hay and convert the proceeds. This advice is not reasonable in the court's view but that is not to say the Debtors reliance was not reasonable. The Wehris themselves were aware of the security agreements, knew the Bank had taken an inventory which included hay, and knew the hay had been included as an asset on the 1995 financial statement. Concerning the fact of this knowledge, did the Wehris reasonably rely upon counsel's advice in disposing of the hay? Or, on the other hand, did they act believing counsel's advice to be wrong, and thereby intentionally harming the Bank's interest? As for the hay sale, the court believes the Debtors placed complete reliance upon counsel's advice. One of the Bank's loan officers himself felt that Wehris believed they were within their rights to sell the hay. Even though counsel's advice was ill-considered, it does serve to absolve the Debtors of the requisite intent to harm the Bank's security interest. The court believes their actions as regards the hay were taken in an honest but mistaken reliance on counsel's advice—not out of an intent to injure the Bank.

The court does not reach the same conclusion regarding the missing $1,400 of swather proceeds, the $1,000 in hog proceeds or the missing 1,444 bushels of wheat. A debtor's testimony bearing on the issue of intent may be impeached by inconsistencies in that testimony as well as the contradictory testimony of other witnesses and contradictory documents. *Waugh,* 95 F.3d at 711–712. Wehris explanations of why these items of collateral were sold, were missing, or were not surrendered to the Bank are not credible, particularly in light of the contradictory explanations offered on the machinery ownership issue. They are self-serving explanations cast in the same mold as the explanations offered for financial statement, bankruptcy schedule and statement of affairs omissions. As to the disposition of these items and their proceeds the court believes the Wehris acted willfully with the requisite intent to deprive the Bank of their collateral. The measure of damages for conversion is the fair market value of the converted property as of the date of the conversion. *In re Collins,* 151 B.R. 967, 970 (Bankr.M.D.Fla.1993); *In re Iaquinta,* 95 B.R. 576, 582 (Bankr.N.D.Ill.1989). The court is satisfied from the evidence that the Wehris converted $1,400 in proceeds from the swather sale, $1,000 in proceeds from the sale of hogs and $6,584.64 in wheat sale proceeds (1,444 bushels at $4.56 per bushel) in violation of § 523(a)(6).

### Conclusion

For the foregoing reasons, the Complaint of the Security Bank of Hebron based upon sections 523(a)(2)(A) and (B) is dismissed. The Security Bank of Hebron is granted judgment on its complaint of nondischargeability based upon section 523(a)(6) with the sum of $8,984.64 declared nondischargeable by reason of conversion.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**